BENJAMIN HANEY, CHARLES OGDEN, AND JOHN TRENCHARD, LIBELLANTS AND APPELLANTS, *v.* THE BALTIMORE STEAM PACKET COMPANY, OWNERS OF THE STEAMER LOUISIANA, AND GEORGE W. RUSSELL.

In a collision which took place in the Chesapeake bay between a steamer and a sailing vessel, the steamer was in fault.

It was the captain's watch, and his duty to be on deck, which he was not.

The only man on deck, acting as pilot, lookout, and officer of the deck, was not in the proper place for a lookout to be.

A former decision of this court referred to, indicating the proper place for a lookout.

When the collision was impending, the order on the steamer was to starboard the helm instead of porting it, the schooner having previously kept on her course, as the rules of navigation required her to do.

THIS was an appeal from the Circuit Court of the United States for the district of Maryland, sitting in admiralty.

It was a case of collision occurring in the Chesapeake bay, between the steamer Louisiana and the schooner William K. Perrin, by which the schooner was sunk.

The libel was in rem, filed by the appellants against the steamer, and George W. Russell, master thereof. The Baltimore Steam Packet Company intervened and answered as the owner of the steamer.

The evidence in the case is so fully commented upon in the opinion of the court and in the dissenting opinion of Mr. Chief Justice TANEY, that any repetition of it is unnecessary.

The District Court decreed in favor of the libellants in the sum of seventeen hundred dollars, and of Charles Ogden, the master of the schooner, the additional sum of $173 and costs.

On an appeal to the Circuit Court, additional evidence was

offered, and the decree of the District Court was reversed and the libel dismissed.

The libellants appealed to this court.

It was argued by *Mr. Addison* and *Mr. Battee* for the appellants, and by *Mr. Schley* for the appellee.

The points made by the counsel for the appellants were the following:

1. That it is the right and duty of sailing vessels, when meeting steamers, to hold their course, and of steamers, to give way to them.

St. John *v.* Paine, 10 Howard, 583.

Steamer Oregon *v.* Roca, 18 Howard, 572.

2. That the schooner, from the time the steamer hove in sight until a moment or two before the collision, steadily held her course. The answers of the defendants, the evidence of the witnesses for the defence, and the evidence for the libellants, all concur in this; and there is not a witness who alleges the contrary. And this must be taken as a fact in the cause, admitted by the defendants, proved by the defendants, and proved by the plaintiffs.

3. That it was the right of the schooner to change her course, when her continuing to hold it would have caused her to have been run down.

New York and Liverpool U. S. Mail Steamship Company *v.* Rumball, 21 Howard, 372.

4. That if the danger of being run down was imminent, and the schooner made a false manœuvre, when a right one would have saved her, even then the steamer is responsible; for she ought not needlessly to have run so close to the schooner as to have excited such well-founded apprehensions of danger as to have disturbed the judgment of those in charge of her.

The Genesee Chief, 12 Howard, 44.

5. That the account of the disaster set up in the answer, and given by Captain Russell and second mate Ward, is incredible, because it is impossible it can be correct.

For if the parallels on which the vessels were running were 150, or 200, or 300 yards asunder, and the schooner changed

her course at the distance of 100 or 150 yards from the point at which they would have passed each other, if there had been no change of course, the schooner could not have crossed the steamer's bows, as the steamer's speed was twice that of the schooner.

6. That although Captain Russell and second mate Ward testify to the events immediately preceding the collision, it is very clear:

First. That Capt. Russell did not see the schooner after she got within three or four miles of the steamer, until the schooner's course had been changed—that is, for nine or twelve minutes before such change.

Second. That the second mate Ward's attention was directed to and absorbed in the changing of the course of the steamer when the schooner changed her course.

7. That the schooner, in attempting to avoid the steamer, turned to the right, and thus conformed to the rule of navigation established and promulgated by the Supreme Court in the case of the steamer Oregon et al. *v.* Roca et al., 18 Howard, 572, where this language is employed: "The rule adopted by the Trinity masters, and sanctioned by this court, is the safe one: that when two vessels on opposite tacks are approaching each other, each should turn to the right, passing each other on the larboard side. This rule is too simple to be misunderstood, and if observed, collisions would not occur between moving boats, whether propelled by sail or steam. The rule once established, every deviation from it should be chargeable as a fault."

The Friends, 1 W. Robinson, 479.

Steamer Oregon *v.* Roca et al., 18 Howard, 572.

8. That the steamer violated said rule by turning to the left, and thereby caused the collision.

9. That there was not on the steamer "a trustworthy and constant lookout," "whose whole business was to discern vessels ahead or approaching, so as to give the earliest notice to those in charge of the navigation of the vessel;" and that the omission is *prima facie* evidence that the steamer is in fault.

Steamboat New York et al. *v.* Rea et al., 18 Howard, 225.

Genesee Chief, 12 Howard, 449.

Chamberlain *v.* Ward, 21 Howard, 548.

10 Howard, 585.

10. That the person alleged to have been acting as lookout was not "actually and vigilantly employed in his duty as lookout," (12 Howard, 459;) but was in effect the helmsman, superintending a negro who performed merely the manual labor of working the wheel; who, the lookout testifies, "acted by my orders in the management of the wheel," and "I leave nothing to his discretion;" and "I give the order, and see and hear if it is obeyed."

Ward says: "I" (on the occasion of the collision) "put the helm of the steamer starboard. I had just steadied the boat on that course, and discovered the schooner had altered her course."

11. The fact that the steamer was engaged in carrying the United States mail furnishes no excuse for proceeding at a speed endangering the lives and property of citizens.

The Rose, 2 W. Robinson, 3.

The Iron Duke, 2 W. Robinson, 385.

Rogers et al. *v.* Steamer St. Charles et al., 19 How., 112.

12. In cases of collision between steamers and sailing vessels, "*prima facie,* the steamer is chargeable with fault. The exception to this rule must be clearly established by strong circumstances, to excuse the steamer."

New York and Virginia S. Ship Co. *v.* Calderwood et al., 19 Howard, 246.

Steamer Oregon *v.* Roca, 18 Howard, 572.

13. The pretended lookout was stationed in the pilot-house, and not in the forward part of the vessel, where he should have been.

Newton *v.* Stebbins, 10 Howard, 607.

St. John *v.* Paine et al., 10 Howard, 585.

Chamberlain et al. *v.* Ward, 21 Howard, 571.

*Mr. Schley* made the following points:

1. The change of the course of the schooner was the proximate and only cause of the collision; and if such change had

not been made, the vessels would have passed each other in safety.

2. The change of course on the part of the schooner, at the time and under the circumstances, was a gross and inexcusable fault.

3. The pilot-house on the steamer Louisiana (as shown by the uncontradicted testimony taken on behalf of the appellee since this appeal, and contained in the depositions of Captains Virden, Turrer, Rice, and Weems) was the best position for the lookout on the steamer; and there was no want of care and no error of judgment on board of the steamer, in any respect.

Mr. Justice GRIER delivered the opinion of the court.

The appellants, owners of a schooner called the William K. Perrin, charge in their libel that between nine and ten o'clock of the evening of 20th of February, 1858, as the schooner, laden with oysters, was on her way down the Chesapeake bay, she was run into and sunk by the steamboat Louisiana; that it was a bright moonlight night, and the schooner, though of only forty-three tons burden and deeply laden, could be and was seen at the distance of a mile.

The answer admits the collision and the result of it. It admits, also, the schooner was seen at a distance of two or three miles; that the steamer was proceeding at a rate of fourteen miles an hour, "heading due north," and the schooner holding her course nearly due south. But it alleges as an excuse, that while the steamboat and schooner were meeting on parallel lines, the schooner suddenly changed her course and ran under the bows of the steamer.

This is the stereotyped excuse usually resorted to for the purpose of justifying a careless collision. It is always improbable, and generally false.

There is not the usual conflict of testimony in this case; for the single person on board of the steamer who was able to give any account of the collision, who acted as pilot, and by whose want of vigilance and skill the collision was caused, does not materially contradict, but rather confirms, the testimony of the libellants. The facts of the case are as follows:

The steamer Louisiana, of eleven hundred tons burden and five hundred horse-power, was on her way coming up the wide bay of the Chesapeake, steering a due north course, between nine and ten o'clock at night. The small heavy-laden schooner is seen two or three miles off, coming in an opposite direction. The captain of the steamer, (whose theory of action appears from his own testimony to be, that all small vessels are bound at their peril to get out of the way of a large steamer carrying the United States mail,) although he had seen the schooner, and knew that the vessels were approximating at the rate of over twenty miles an hour, retires to his cabin. It was his watch and his duty to be on deck as officer of the deck. He leaves on deck one man, besides the colored man at the wheel, to act as pilot, lookout, and officer of the deck. These two persons constituted the whole crew on duty, besides firemen and engineers. This person, who had to perform these treble functions, was the second mate. His theory is, that the best place for a lookout is in the pilot-house, where, he says, "*I generally lean out of the window, and have an unobstructed view.*" Accordingly, as pilot, he remained in the pilot-house to direct the steersman; and as lookout, he occasionally leaned out of the window.

The result shows the value of this theory with regard to the place and person proper for a lookout. The schooner kept on her course, as the rules of navigation required her to do, on the presumption that the steamer would diverge from her course so as to leave a free berth to the schooner, as it was the duty of the pilot of the steamer to do. The boats were approximating at the rate of six hundred yards a minute, or one hundred yards in ten seconds. A slight turn of the wheel of the steamboat, if given in due season, would have left a wide berth for the schooner. But this, by his own account, was neglected by this pilot and lookout till within *ten seconds* or less of a collision; and then the order was to starboard the helm, instead of porting it, in direct contravention of the rules of navigation.

The steamer, it is true, had a right to pass on either side, and it was her duty to keep clear and give a wide berth to the

sailing vessel; but having neglected this duty till the danger of a collision was so imminent that it was probable the schooner would be making some movement to avoid destruction, such a movement only increased the danger of a collision.

The man at the wheel of the schooner had his orders to keep steady on his course south. It is proved, without contradiction, that this order was strictly complied with till the pilot or steersman heard the noise of the steamer's wheels; and being warned of her approach by the lookout, he looked under the boom, and discovered the steamer almost on him; when, in order to save his own life and the lives of the crew, he ported his helm and received the blow on the larboard side of the schooner, near the stern, instead of the bow. The point of collision confirms, beyond a doubt, this view of the case.

The hypothesis set forth in the answer to excuse this collision, that the boats were passing on parallel lines, three hundred yards apart, and that, when within one hundred or one hundred and fifty yards of passing each other, the schooner turned round and run herself under the bows of the steamer, is not only grossly improbable in itself, but contradicted by the testimony, and is a mathematical impossibility.

With this pregnant example of the value of the theory of lookouts contended for in this case, let us compare it with the rules established by this court. Without referring to the numerous cases, the correct doctrine on this subject will be found laid down by Mr. Justice CLIFFORD in delivering the opinion of this court in Chamberlain *v.* Ward, 21 How., 570:

"Steamers navigating in the thoroughfares of commerce must have constant and vigilant lookouts stationed in proper places on the vessel." They must "be persons of suitable experience, and actually and vigilantly employed on that duty." "In general, elevated positions, such as the hurricane deck, are not so favorable situations as those more usually selected on the forward deck, near the stem." "Persons stationed on the forward deck are less likely to overlook small vessels deeply laden, and more readily ascertain their exact course and movement."

The entire disregard of these rules of navigation by the

steamer, and the consequent destruction of property, demonstrate their correctness and utility.

In fine, we are of opinion that the collision in this case, and destruction of the schooner Perrin, was caused wholly by the negligence and inattention to their duties of the officers who navigated the Louisiana, and that the steamboat should be condemned to pay the whole damage incurred by the said collision.

Let the decree of the Circuit Court reversing the decree of the District Court be reversed.

Mr. Chief Justice TANEY dissenting.

I dissent from the judgment of the court. It is a case of collision on the Chesapeake bay, and involves principles and rules of decision of great interest in the navigation of its waters, where sailing vessels and steam vessels are continually meeting and passing each other in the night, as well as in the day. I think it my duty, therefore, to state the principles of law and the evidence in the case, upon which my opinion has been formed.

The rules of law applicable to a case of this description, as established by this court, I understand to be the following:

1. The vessels, whether sailing vessels or steamboats, must be manned and in charge of a crew competent to navigate them on the voyage in which they respectively engaged.

2. It is the duty of each vessel to have a lookout, acquainted with his duty, and faithfully discharging it, and stationed at that part of the vessel which will best enable him to see any impending danger, and promptly warn the helmsman of the point from which it is approaching.

3. It is the duty of a sailing vessel when meeting a steamboat to keep on her course, unless she is prevented by the change or direction of the wind; and it is the duty of the steamboat to keep out of her way, passing on the starboard or larboard side, as the steamboat may prefer.

4. Each vessel has a right to act on the presumption that the other knows its duty, and will act accordingly. But if the steamboat fails to shape her course to avoid the sailing vessel,

in proper time and at a sufficient distance, the steamboat is answerable for the disaster, although the collision may in fact have been produced by an erroneous movement made by the sailing vessel in the moment of peril, and intended to avert the impending danger.

5. The distance at which a steamboat should pass must in some degree depend on the wind and weather, and on the light or darkness of the time and the size of the respective vessels. And, in order to excuse an erroneous movement on the part of the sailing vessel, the proximity of the steamboat, and her course and speed, must be such that a mariner of ordinary firmness, and competent skill and knowledge, would deem it necessary to alter his course to enable his vessel to pass in safety. But, in order to justify this, the dangerous proximity must be produced altogether by the steamboat.

These principles and rules of navigation are distinctly laid down in the cases of the Genesee Chief v. Fitzhugh, 12 How., 461, and the New York and Liverpool United States Mail Steamship Company v. Rumball, 21 Howard, 383, 384, and have been recognised and maintained by this court in many other cases of collision between steamboats and sailing vessels. It would be tedious, and is unnecessary, to enumerate them, as they all affirm the same rules of navigation.

I have stated them in separate propositions, because it is of the first importance that they should be clearly defined and understood. And impartial justice requires that they should be administered and enforced where they apply to the sailing vessel, as well as to those propelled by steam. Indeed it is impossible for the steamboat to perform its duty of keeping out of the way at a safe distance, unless the sailing vessel performs its duty by keeping steadily on her course when the wind will permit. And those who intrust their property in sailing vessels, or their cargoes to the care of persons ignorant of their duty, or incompetent in any other respect, have no just right to ask that others who have committed no fault should be compelled to share in their loss.

Keeping in view these established laws of navigation, I proceed to examine as briefly as I can the testimony; and first,

the conduct and management of the schooner Perrin, the sailing vessel.

The collision took place near the mouth of the Rappahannock, at about ten o'clock on the night of the 28th of February, 1858. It was a moonlight night, and a vessel under sail, without lights, could be seen at the distance of three or four miles.

The schooner was an oyster-boat, of about 40 tons burden, and about sixty feet long, and eighteen feet beam. She belonged to Philadelphia, and had obtained a cargo of oysters in the Patuxent river, and sailed from the river about two o'clock of the day above mentioned, down the bay, for the capes of the Chesapeake, bound for her home port. It was a cold night, the wind from the northwest, a stiff breeze, nearly fair, but coming rather from the western land. The sails of the schooner were consequently spread out on her larboard side— that is, on her eastern side, as she went down the bay. She moved at the rate of six or seven miles an hour. Her crew consisted of Charles Ogden, captain, and five other persons, including the oystermen on board; and the latter, when not dredging for oysters, assisted in navigating the vessel.

At half past eight o'clock, on the night of the disaster, the captain and all of the crew, except the witnesses, William J. Miles and Charles Cory, went below to sleep; and from that time until the collision, no one but these two men were on deck, or assisted in any way to navigate the vessel, and therefore have no knowledge of what led to the disaster.

In weighing the testimony given by these two witnesses, it must be borne in mind that both of them have a direct interest in the result of the case, and will share largely in the damages that they may by their testimony recover from the steamboat. Cory says, that two-thirds of the oysters belonged to Miles and himself, and Ogden, the captain, after one-third and the expenses were taken out. Each of these witnesses, therefore, is giving testimony in his own cause to support his own claim; and they are substantially parties prosecuting the suit, although they appear only as witnesses in the record. They may be admissible from necessity. But it is a departure and

exception to the general rules of evidence, long and well established in courts of common law and equity, and goes always strongly to their credit; and the facts stated by such witnesses, as well as their manner of stating them, are carefully scrutinized by courts of justice, in considering the case. The wisdom and justice of the common-law rule will, I think, be apparent when we examine the testimony of Cory and Miles.

Cory's account of himself is this: He has been following the water as an oysterman four years and a half, during the oyster season; and on such occasions, when he is not dredging for oysters, it is a part of his duty to help to navigate the vessel and to help to look out, and he is always in one of the watches. But he had never before been down the bay below the Patuxent. He was the lookout, and the only one, in this part of the voyage. He says he saw the steamboat when about three or three and a half miles off; that he was walking on the larboard—that is, the leeward and eastern side of the vessel, and saw the steamboat between the night-head and fore shroud of the schooner; and she was to the leeward, larboard and eastward; and that, immediately upon seeing her, he said to Miles, the helmsman, "hadn't you better keep away?" and about five minutes afterwards, asked him again, if he hadn't better keep away; and receiving no answer to either question, he seems to have supposed that he had performed his whole duty as a lookout; for he appears to have made no further effort to communicate with the helmsman, and to have taken no further concern in the navigation of the vessel, before the collision happened.

It is evident from this testimony, given by the witness himself, that he was utterly unfit for a lookout, and performed none of its duties. He was not at the bow or near the head of the vessel, nor even on the windward side, where the sails would not have obstructed his view ahead, but was walking on her larboard or leeward side, and must have been aft of the foremast, as he first saw the Louisiana between the night-head and fore shroud. This was no place for a lookout, for the foresail and head sails were directly before him, and made it

impossible for him to see the bearing or distance of any vessel approaching directly ahead, or on her larboard or eastern bow. And although he swears that he did, notwithstanding these obstacles, see her to the leeward and eastward of his vessel, he obviously contradicts himself, when he immediately after states that he twice advised the helmsman to alter his course more to the east; for if he really thought the steamboat bore to the east of south, his advice to the helmsman was to put the schooner directly in her way, instead of avoiding her; nor can the slightest reliance be placed upon his statement that the steamboat was to the eastward, or that the schooner was standing due south when he first saw the steamboat, or that she did not change her course until she luffed to the west a moment or two before the collision; for he had no compass before him; had never before been in that part of the bay, and under such circumstances could form no accurate judgment of the cardinal points of the compass; it was simply impossible that he could know whether the steamboat bore some points to the east or west of south, or that his vessel was heading due south, or two or three points to the east or to the west of south; or whether she did not vary in her course two or three points as she was approaching the steamboat before she changed directly to the west.

It would seem that he placed himself on the larboard side under the lee of the mainsail to shelter himself from the cold northwest wind, and in that situation it is literally impossible that he could know the precise course the schooner steered, or the bearing of the steamboat when he first saw her, and as he approached her; and it is equally impossible that he should have given the advice he did to the helmsman, if he really thought the steamboat bore east from the schooner.

The testimony of Miles, the only other material witness for the libellants, will show that he was as unfit for a helmsman as Cory was for a lookout, and that the facts he states are as little to be relied on.

He says he has been following the water as an oysterman thirteen or fourteen years, and accustomed to take the helm for the last four or five years; and it does not appear that he

was ever before in that part of the Chesapeake bay; he was standing on the larboard side of the vessel, the same side with the sails, with his right hand on the helm, and from his position could see nothing ahead without going upon one knee, and looking under the boom; and when Cory told him there was a light ahead, he looked under the boom, and saw the Louisiana about one-half or three-quarters of a point to the eastward of the schooner.

Now, when he saw the steamer approaching, it was his duty, according to the repeated decisions of this court, to stand by his helm, with his eye on the compass, and keep the vessel steadily in her course, and rely on the lookout for information as to the approach and bearing of the steamboat; his own course at the time, he says, was due south.

But instead of doing this, he immediately took upon himself the additional duty of lookout, under circumstances that made it impossible he could perform either. He was on his knee from a half to three-quarters of an hour before the collision took place, watching the steamboat under the boom of his vessel. He says, indeed, that he did not watch her all the time, but watched his course; yet he tells us the boom was only 3 or $3\frac{1}{2}$ feet from the deck, and therefore, in order to look under it, he was obliged not only to go on his knee, but to bring his head down to within two or three feet of the deck; and in that posture, while watching the steamboat, it was absolutely impossible for him to know the exact course he was then steering, or form a correct judgment of the distance or bearing of the steamboat, for the compass was hid from him by the sides of the binnacle in which it stood, and his view ahead, and on the eastern bow of his vessel, obstructed by the foresail and head sails, which were spread out on the same side. And when he speaks of bearings and distances, he speaks, necessarily, not by the compass, but from vague conjectures, and states facts of which he could have no certain knowledge, and was not in a situation to form an opinion upon which any reliance could be placed; he admits that where he stood, with the compass before him, he could not

see the Louisiana, and consequently could not see how she bore by the compass.

Again, he says Cory was looking out at the time of the collision, and was a competent lookout; yet his own testimony shows that he did not think so, nor places the slightest confidence in him; for as soon as Cory reported the steamboat in sight, he took upon himself the duty of lookout, as well as helmsman, although he was at the stern of the vessel, and could see nothing ahead except under the boom. And from the time the Louisiana came in sight, he was so absorbed in these double duties, or confused and bewildered by the appearance of the steamboat, that he does not appear to have remembered there was such a person as Cory on deck; he asked no information from him, and did not even hear him when he twice advised him to keep his vessel off; yet Cory was standing within a few feet of him, with nothing but the mainsail between them, and he had heard readily and distinctly when he reported to him that the steamboat was in sight.

He says he kept his course due south. I have already said he could not know the fact, as a large portion of his time was passed in watching the steamboat, with his head in a position which made it impossible for him to see his compass. And with his right hand on the helm, and stooping low on the larboard side to see under the boom, his right arm would naturally and necessarily follow the movement of his body to the larboard, and draw the tiller with it, and cause the vessel from time to time, with such a strong wind pressing on her mainsail, to head towards the west, and edge nearer and nearer to the due north line in which the Louisiana was moving, and thus, by his own incapacity and fault, produce the proximity which so much alarmed him, and induced him suddenly to change his course to the west. It is true, the lookout on board the Louisiana says she appeared to be standing south, and that he did not observe any change until she suddenly luffed to the west. But Captain Russell states, and every seaman knows, that you cannot, in the night, determine the precise course which an approaching vessel ahead is steering; and coming, as this schooner did, with a free wind, she might

frequently vary from her general course, from time to time, one or two points, for two or three minutes, and the most vigilant lookout on the steamboat fail to discover it or observe it; yet, at the speed at which she was going, she would, by the slightest movement of the helm to the larboard, or the least relaxation of the hold of the helmsman, head more to the west, and approach nearer to the line of the steamboat, and increase the danger of a collision.

Indeed, Miles admits that his vessel did vary a little, but not enough, he says, to take her from her course; he does not, however, tell us how much she varied, nor what variance he thinks necessary to take her from her course, nor how long it continued, nor in what direction. It is obvious, from what he says of his own position and movements, that every variation from her general course must have been towards the west.

I do not think it necessary to comment further on the evidence given by these two witnesses. Testifying in the manner I have stated, and under the influence of a direct pecuniary interest in the result, I cannot think their statements would be entitled to any weight against the steamboat, even if uncontradicted by other testimony; but in all of its essential parts it is contradicted by disinterested witnesses who were on board of the Louisiana, and I proceed briefly to state the testimony of Captain Russell, and Ward, the second mate, who are the only two material witnesses on behalf of the steamboat. The disaster happened in the captain's watch, during which the second mate, Ward, was the lookout, and charged with the running of the vessel; the wheelsman was a colored man, and could not, therefore, be examined as a witness; but it is abundantly proved that he was an experienced wheelsman, and accustomed to perform that duty on steamboats, and was fully competent and trustworthy.

Captain Russell and the mate have for many years been engaged in the navigation of steamboats up and down the bay, at all seasons of the year; are both pilots of long experience, and well acquainted with the dangers to be apprehended, and are accustomed to meet and pass vessels at all hours of the night

and of the day.   Neither of them have any pecuniary interest in the result of this controversy, and they are both men of undoubted character for intelligence and veracity.

It has indeed been said, that the answer of Captain Russell to the libel, and his testimony as a witness, contradict one another, and that, on that account, credit ought not to be given to his testimony; but I can see no discrepancy between them.   In his answer, he speaks in general terms of the disaster and the causes which led to it, and that is all that was proper or usual to state in an answer.   When examined as a witness, he enters more minutely into the circumstances, and mentions his momentary absence from the deck just before the Perrin changed her course to the west, but there is no contradiction or discrepancy in this; and it is hardly just to a witness to select a detached sentence from the answer, and another from the testimony, to show an apparent contradiction, when the two papers, read throughout, are perfectly consistent with each other, and substantially the same; and in both his answer and his deposition as a witness he supports and confirms the testimony of Ward, the lookout, in every fact material to the decision of the case.   Ward says he was stationed in the wheel-house, or pilot-house, as the place is indifferently called; the house is about sixty feet from the bow, upon the upper deck, and elevated about twenty-five feet; he stood by the side of the wheelsman on the larboard side of the house, and the wheelsman on the starboard, about four feet from him; and the compass was in the wheel-house, in front of the wheelsman.

It has been argued that the lookout ought to have been at the bow, and some passages in the opinions of this court in former cases are relied on to support this objection.   But the language used by the court must always be construed with reference to the facts in the particular case of which they are speaking, and the character and description of the vessel. What is the most suitable place for a lookout, is obviously a question of fact, depending upon the construction and rig of the vessel, the navigation in which she is engaged, the climate and weather-to which she is exposed, and the hazards she is

likely to encounter, and must, like every other question of fact, be determined by the court upon the testimony of witnesses—that is, upon the testimony of nautical men of experience and judgment.  It cannot, in the nature of things, be judicially known to the court as a matter of law.  All that the law prescribes is, the rule that the lookout shall be stationed in that part of the vessel where he can most conveniently and effectually discharge the duty with which he is charged.  And all of the experienced pilots who have been examined as witnesses in this case, accustomed to the navigation of the bay, well acquainted with the form and construction of the Louisiana, unite in testifying that the place where Ward was stationed was the best and most suitable; and they point out the serious disadvantages that might arise from stationing him at the bow.  There can hardly be a rule of law which requires a steamboat to station a lookout in a place where he cannot effectually perform his duty.  In a vessel propelled by sails, he is uniformly stationed at the bow, because, in any other part of the vessel, his view ahead would be obstructed by the head sails and rigging.  But this reason does not apply to steamboats constructed like the Louisiana.

Taking it, therefore, as fully established by proof, that Ward, the lookout, was competent, and stationed in the proper place, I proceed to state his testimony, which is as follows:

He saw the schooner when about three or four miles off.  The steamboat was heading a due north course, and the schooner appeared to be heading south, and bore by the compass north half east on the starboard (eastern) side of the steamboat.  When the two vessels approached within the distance of 300 or 400 yards, the schooner bore north one point east on the starboard side of the Louisiana; and when within about 150 yards of the schooner, in order to give a wider space in passing, he headed the steamboat north by west, which left the schooner bearing two points east on her starboard bow.  He had just steadied his boat in this course when he discovered that the schooner altered her course, and was heading west across the bay, and continued to hold that course until the collision took place.  The moment he dis-

covered that the schooner had changed her course, he gave the signal to stop and back, which was instantly obeyed. But the vessels came together before the headway of the steamboat was entirely stopped.

The testimony of this witness, supported as it is by that of Captain Russell, can hardly be impeached by such testimony as that which has been given by such witnesses as Cory and Miles.

And I regard this as the true history of the disaster, and of the movements of the vessels by which it was produced.

The facts established by this proof, that the schooner bore north half east when first seen at the distance of three or four miles, and north one point east when at the distance of about 300 yards, show that, from the causes I have before mentioned, she had not maintained her course due south during that time, but had been luffing and edging to the west, so as to bring her nearer and nearer to the due north line in which the steamboat was steering; for, if they had approached each other in parallel lines, the schooner would have borne more and more to the east, and would have been directly east when they passed, and would therefore, when within 300 yards, have borne more than one point to the east of north. But even then, if she had continued to hold her course due south, and the steamboat had continued hers due north, they would have passed in safety, but nearer, indeed, than a steam vessel of the size of the Louisiana ought to pass so small a vessel as the oyster-boat. But when the steamboat changed her course one degree more to the west, it is evident that they would have passed each other not only in safety, but at a convenient and sufficient distance; for, it will be observed, that, for the distance of one hundred and fifty yards at which the steamboat changed her course, she was proceeding slowly, backing with all the force of her machinery, and with so much effect that her headway was nearly stopped when they came in contact. This is proved by the character of the injury inflicted. It is true that the side of the schooner was broken in, and an opening made, through which the water rushed in, and filled and sunk her in a few minutes. The witnesses for the libellants,

who examined the schooner at Norfolk after she had been raised and carried into port, say that the blow "had hit the main beam across the break of the quarter, and split it—knocked the knees out from each side of it, and cut her down to light-water mark." But it did not even upset her. Cory, indeed, says that her stern was driven under the water. But Miles, who was at the stern, does not support him. On the contrary, he says the blow threw him to the windward, (that is, to the opposite side,) and that he went up the rigging of his vessel until he got on the bow of the steamboat. He does not intimate that he was in danger of being washed overboard or plunged into the water. Now, with the immense weight and size of the Louisiana, coming stem on, against the broadside of the comparatively slender and frail timbers and planks of this little oyster-boat, if the headway of the steamboat had not been very nearly stopped before she struck the schooner, the injury inflicted must have been much greater than that described by the witnesses. If she had been moving at even one-third of her ordinary speed, she would unquestionably have buried this little boat in the water, and passed over her. These facts of themselves show that her rate of speed for these 150 yards, taking it all together, could not have averaged, at the outside, more than four or five miles an hour.

Now, the schooner changed her course to directly west almost simultaneously with the reversal of the engine of the steamboat, approaching her line of movement nearly at a right angle, and was moving from east directly west during the time the steamboat was passing over this 150 yards. She was moving, also, with equal or greater speed, for all of the witnesses agree that she was sailing at the rate of six or seven miles an hour; and when she changed her course to west, she was in full headway, with all sails set, and must have maintained, during that time, at least very nearly the speed at which she had before been sailing; and this being the case, she must, in order to bring the vessels into contact, have passed nearly the same distance to the west which the steamboat, while backing, had passed to the north—that is, 150 yards; and consequently, if she had held on her course, would

have passed at that distance, or nearly so, to the eastward of the steamboat.

It has, indeed, been said that the collision was immediate after the change of course by the schooner, and the backing of the steamboat; and calculations have been presented to show that it must have been so, because, from the combined speed of the two vessels, taken together, the 150 yards would be passed over in a few seconds. But this argument has no foundation in the evidence; for the steamer was not proceeding at her ordinary speed, but backing all the way, and had nearly stopped when she came in contact with the schooner. And the latter vessel was not meeting her from an opposite direction, but standing directly across her path, leaving the steamboat to pass over these 150 yards, and at the reduced rate of speed of which I have spoken, before the vessels could come together.

In reference to this part of the evidence, it is, perhaps, hardly necessary to notice the evidence of Miles, who says they were within thirty yards of the steamboat when he changed his course to the west. No one, I presume, will think that his testimony in this respect is entitled to any weight, when in conflict with the testimony of Captain Russell and the mate, Ward, who were both in a position to see perfectly what was before them, and accustomed, by long experience, to measure distances on the water by the eye, while Miles was looking under the boom of his mainsail with his head near the deck, and his vision obstructed by the sails and rigging of his own vessel. He was in no position to form a correct judgment of distances any more than of bearings; and even Cory contradicts him, and says, that " we did not change our course until we were within 150 yards, if, indeed, we were more than 100 yards from the Louisiana." He, in effect, corroborates the testimony of Captain Russell and Ward.

It has been said, also, that the steamboat ought to have slowed her speed before she approached so near as 150 yards to the sailing vessel. But this argument loses sight of the fact that, until the schooner changed her course to the west, those on board of the steamboat had no reason to suppose that

there was the slightest danger of collision, or any reason for slackening her ordinary speed. They had a right to presume, and indeed were bound to presume, that the schooner would steadily hold on the course she was steering, and the steamboat had shaped its course to keep out of her way, and pass her at a safe and convenient distance. And the moment they discovered that the schooner had changed her course, and was heading in a direction that might produce collision, she instantly stopped and backed, and took every measure in her power to avert the danger. But until the change of course by the schoonor, there could be no reason and no obligation whatever to slacken her speed; for it can hardly be supposed that a steamboat is bound to stop or slacken her speed whenever she sees a sailing vessel coming in an opposite direction, and wait to see whether she will conform to the rule laid down by this court, and hold her course, or suddenly change it to cross the line in which the steamboat is moving. Such a rule would make steamboat navigation of very little value on the Chesapeake. But unless such is to be the rule, I can see no ground for imputing it as a fault to the steamboat, that she did not slacken her speed until she came within 150 yards, when it is admitted that the schooner did not change her course to the west until she had come within that distance of the steamboat.

As relates to the general rate of speed of the steamboat, no one acquainted with the navigation of the Chesapeake has ever suggested or supposed that it was dangerous to life or property on that wide bay; and there is no evidence from which such an inference can be drawn. The fact that the Louisiana carried the mail, and was obliged to proceed at the rate of fourteen or fifteen miles an hour, in order to fulfil her contract, certainly gave her no rights or privileges beyond those of any other steam vessel, nor exempted her in any degree from the care, caution, and watchfulness, in speed as well as in everything else, required of others. The fact that a contract was made is perhaps some evidence that the public authorities of the United States, having all the means of information within their reach, were satisfied that the rate

of speed required was not dangerous to the life or property of our citizens who are accustomed to navigate the bay.

It is unnecessary to remark upon the testimony given by the captain of the Keyser, which sailed from the Patuxent in company with the Perrin. He was, he says, three-quarters of a mile off, and could in the night, even by moonlight, have no certain and accurate knowledge of the bearing of the colliding objects towards each other as they approached, or the particular incidents of the collision; the more especially as both vessels were ahead of him, and to leeward, and hidden from him by his own sails as he stood at his helm. He says, too, that before the collision, he paid very little attention, and what he did see was by looking under his boom.

Neither do I attach any importance to conversations and statements made on board the Louisiana after the collision. Declarations made in conversation are apt to be loose and unguarded—are often misunderstood, and, in my judgment, entitled to very little weight in any case, and least of all in a case like this, where the minds of all had been excited and agitated by the scene through which they had so recently passed.

There is no other evidence in the record which appears to be material to the points I am discussing, and I forbear, therefore, to refer to it. This opinion already occupies more space than I anticipated. But, as the full statement of the testimony cannot be given in the report of the case, I have found myself unable to present the facts truly and fairly, as I understand them, in fewer words.

I fully agree with the court, that the strictest supervision should be held over steamboats. But it is impossible for them to perform the duty of keeping out of the way, unless the sailing vessel is held to the correlative duty of keeping her course. Even-handed justice requires that the law of navigation should be as obligatory upon the sailing vessel as it is upon the steamboat. This is a question of property, and the rights of the parties are to be ascertained and determined by the rules of law. And where the evidence shows, as I think it does, that the Louisiana performed her duty, and took

proper measures to keep out of the way, and her efforts were counteracted and defeated by the sailing vessel, and a collision forced upon the steamboat by the incapacity and misconduct of those in charge of the Perrin, I cannot think that the steamboat should be charged with any part of the damage which the sailing vessel brought upon itself. Those who intrust their property on the water to incompetent hands have no just right to complain of disasters, and claim indemnity for losses arising altogether from the incapacity and unfitness of those to whom they have confided it, and still less have Cory and Miles, whose incapacity and misconduct were the sole cause of disaster.

And entertaining this view of the controversy, I dissent from the judgment of the court.