### THE MUNALBRO.

(District Court, D. Massachusetts. April 13, 1922.)

No. 2016.

1. Collision ⚙⟹48—Steamer must justify failure to discover schooner.
    A steamer colliding with a schooner must justify herself for failing seasonably to discover the schooner and to keep out of her way.

2. Collision ⚙⟹82(2)—Duty of ship to discover fog bank and moderate speed.
    It was the duty of a steamship to discover a fog bank ahead of it, and to moderate her speed before entering it.

3. Collision ⚙⟹86—Steamer colliding with schooner held solely at fault.
    A steamship colliding with a schooner at night at the entrance to a sound *held* wholly at fault for not sooner discovering the schooner.

In Admiralty. Libel by Charles Pike against the steamship Munalbro. Decree adjudging steamship at fault for collision.

Goodwin, Proctor, Field & Hoar, of Boston, Mass., for libelant.
Burlington, Veeder, Masten & Fearey, of New York City, for claimant.

MORTON, District Judge. This is a case of collision between the steamship Munalbro and the schooner Whiteways. It occurred about 12:06 a. m., July 5, 1921, in the western entrance to Vineyard Sound. The Munalbro is about 375 feet long and 4,000 tons gross register. She was bound to the eastward. Her speed was about eight knots. The Whiteways was a three-masted schooner; she was loaded, as was the steamer, and she was leaving the Sound, bound west. The vessels came together on the northerly side of the entrance, about a mile and a half to the east and south of the lightship, and about two miles to the west and south of Cuttyhunk light.

The account of the accident given by the schooner is that she was proceeding under full sail, with a moderate northeasterly breeze, her booms being well off and guyed on the port side. Her objective was the lightship. Another schooner, the Ononette, with which the Whiteways was in company, had passed her, and at the time of collision was between a quarter and half a mile ahead. The schooner's lookout saw

and reported the lights of the steamer. As the vessels drew together, the officers of the schooner observed that the steamer's course was taking her very close to them. The schooner nevertheless held her course and speed, with the result that the steamer cut across her bow, carrying away her bowsprit and jibboom and all the head sails, and causing severe damage. After the collision the schooner anchored until daylight and subsequently made her way to a repair point.

The steamer's account is that as she approached the entrance she saw the Ononette on her port bow and a steamer somewhat broader off on her starboard bow; that she was not aware of the presence of the Whiteways until the latter's sails were discovered close aboard on the *starboard* bow, and shortly afterward her *red* light; that the steamer's helm was put hard astarboard and the engines reversed in an effort to swing away from the schooner; and that the collision occurred before the steamer had swung perceptibly to her helm.

[1] Obviously it devolves upon the steamer to justify herself for failing seasonably to discover the schooner and to keep out of her way. Her explanation is that the schooner was sailing along in a bunch of rolling fog, which obscured her lights. The steamer also claims that the schooner changed course towards the steamer just before the collision, and that this change of course caused the accident. The schooner's crew deny that they were sailing in a fog, or that there was any fog before the collision, which interfered with her being seen from the steamer, or that she changed course as claimed. It thus becomes necessary to examine with some care the evidence upon these points.

The collision occurred at six minutes after midnight, steamer's time. The clocks of the schooner were an hour faster than those of the steamer. Making due allowance for this difference, there is not much discrepancy in the statements as to the time of the collision. Until midnight the steamer's deck had been in charge of her third mate. About five minutes before midnight the captain came to the bridge, and remained there until after the collision. As the steamer passed Vineyard Sound lightship, it was clearly seen, as was Cuttyhunk light, then some 2½ miles or 3 miles ahead, and Gay Head light about 5 miles to the southeast. The steamer's watch also saw the red light of the Ononette, and observed her as the vessels passed. Just before midnight the Gay Head light was shut out by weather conditions, but Cuttyhunk light continued visible, according to the steamer's witnesses. At some time after the collision both vessels were unquestionably enveloped in fog—the Vineyard Sound lightship began fog signals at 12:15 a. m. according to the testimony. Before daybreak, however, the fog had cleared up.

[2] Whether the fog settled down on that part of the Sound before or after the collision is greatly in dispute; the schooner contending that it was afterward, the steamer that it was before. One of the steamer's officers, who came on deck immediately after the collision, testifies that he did not notice any fog until seven or eight minutes later. The schooner's witnesses are inclined to deny that there was fog at any time during the night. In this they are plainly wrong, and their denial impairs the weight of their testimony. Ward, the mate of the Ononette,

testifies that he heard the crash of collision and, looking back, saw the lights of both vessels. The steamer contends that the schooner was traveling just at the outer edge of the rolling fog bank, so placed that she could see the steamer's lights, while her own were obscured from the steamer—an improbable state of affairs, not consistent with Ward's testimony, nor with the testimony of the schooner's crew, nor of the steamer's own third officer, and her helmsman. I am not satisfied that the facts in this respect are as the steamer claims. I think it more probable that the schooner was visible from the steamer and that her lights were overlooked. There are some things in the evidence which suggest that the steamer's lookout may have been inattentive to his duty. Moreover, if there was a fog bank ahead of her, the Munalbro had no right to plunge into it at full speed. It was her duty to discover it, and to moderate her speed before entering it, as was expressly held in The St. Paul, 11 Asp. Mar. Cas. N. S. 169 (C. A.), and The Strong, 7 Asp. Mar. Cas. N. S. 194.

The remaining question is whether the schooner was also at fault. The steamer contends that the schooner changed course across her bow, and that but for this the vessels would have gone clear. It is a claim which the steamer is obviously in no strong position to make, because nobody on her saw the schooner until just before the collision, and her principal contention is that the schooner was obscured by fog which made it impossible to see her. In collision cases, a claim by the burdened vessel that the privileged vessel changed course and thereby brought about the accident is not infrequently made (see Haney v. Balt. Steam Packet Co., 23 How. 287, 291, 16 L. Ed. 562), but seldom with as little in the way of direct evidence to support it as in the present case. All the witnesses on the schooner have testified that she made no change of course, and no witness on the steamer testifies to having observed such a change. McDormand, the schooner's helmsman, gave a second deposition, as a witness for the claimant, in which he testified that the schooner did change course across the steamer's bow, and that his first testimony was untrue. This and the angle of collision constitute practically all the evidence in favor of the steamer's contention on this point. There are certain grounds for suspicion about the schooner's testimony. If there were any reliable and positive testimony that she changed course, the denials of her crew would hardly suffice to convince me to the contrary. But the testimony of McDormand, who, at one time or the other, has sworn falsely is not reliable. Of a witness in a similar situation, except that his statements in contradiction of his testimony had not been made under oath, Judge Dodge said:

"If he were now to make these statements under oath, * * * I should be unable, under the circumstances shown, to accept or rely upon them for any purpose." The Teaser (D. C.) 217 Fed. 925.

While the angle of collision as described by most of the witnesses was much greater than the divergence of the courses on which the colliding vessels were proceeding, it is to be borne in mind that the impact of the steamer swung the bow of the schooner as soon as the vessels came into contact, and the angle given by the witnesses may be that of a few seconds after the collision, instead of at the moment

ot contract. There may also have been a slight swing of the steamer to port under her starboard helm and the push of the collision. For the schooner to turn across the bow of the on-coming steamer, which she had under observation, would have been, not only a violation of her duty, but an unnatural and improbable thing to do. On all the evidence, I am not satisfied that it took place. Several other charges of fault have been made against the schooner; but they are not substantiated by the evidence, and it is unnecessary to discuss them.

[3] While the case is not free from doubt, it seems to me that it is probably the not unusual one of a sailing vessel nearly ahead of an approaching steamer being overlooked by the steamer. The surrounding circumstances support this view. The Ononette was just ahead of the Whiteways. She had just passed the steamer close aboard, showing her red light. One witness estimates the distance between them at not over 50 yards. It is likely that she distracted the attention of the steamer's lookout for a moment or two. The Whiteways was just behind the Ononette, proceeding on substantially the same course, and also showing a red light. The Whiteways was just enough to the southward of the Ononette to bring her almost dead ahead of the Munalbro, and was following the Ononette so closely that she was not noticed.

It follows that there must be a decree adjudging the Munalbro solely at fault for the collision, and referring the case to an assessor to state the damages.