UNITED STATES of America, as owner of THE S.S. E. KIRBY SMITH, and of her cargo

v.

THE Tug HOLLAND, her engines, etc., and Baker-Whiteley Towing Co., Inc.

In The Matter of The Petition of The BAKER–WHITELEY TOWING CO., as owner of the Tug Holland, for exoneration from or limitation of liability.

ANGFARTYGS A/B TIRFING, owner of the Swedish Motor Ship NYLAND,

v.

The UNITED STATES of America, owner of THE S.S. E. KIRBY SMITH: Baker-Whiteley Towing Co., Inc., and the Tug Holland, official No. 270572, her engines, tackles, etc.

UNITED STATES of America, owner of THE AMERICAN STEAMSHIP E. KIRBY SMITH,

v.

The Swedish Motor Ship NYLAND, her boats, tackles, apparel, etc., and Angfartygsaktiebolaget Tirfin.

Nos. 3842, 3851, 3915, 3916.

United States District Court
D. of Maryland, Admiralty Division.

June 4, 1957.

See also, 145 F.Supp. 904.

Vandeventer, Black & Meredith, Norfolk, Va., and Ober, Williams, Grimes & Stinson, Baltimore, Md. (Hugh S. Meredith, Norfolk, Va., and Randall C. Coleman, Jr., Baltimore, Md. advocates), proctors for Angfartygs A/B Tirfing, owner of the Nyland.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md. (Thomas F. McGovern, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., advocate), proctors for United States, owner of the E. Kirby Smith.

Hagen & Eidenbach, New York City, and Skeen, Wilson & Coughlin, Baltimore, Md. (Henry C. Eidenbach, New York City, and John H. Skeen, Jr., Baltimore, Md., advocates), proctors for Baker-Whiteley Towing Co., owner of the Holland.

ROSZEL C. THOMSEN, Chief Judge.

These suits arise out of a collision at 0310 on March 17, 1956, in Hampton Roads, between the Swedish motor ship Nyland and the Liberty ship E. Kirby Smith, a hulk from the laid-up fleet, which the tug Holland had left anchored in the fairway while the tug sought shelter from a storm.

The questions are: Who was at fault? Is the owner of the tug entitled to limit its liability? Is the government, as owner of the Smith, entitled to indemnity from the tug?

Entering Hampton Roads from the east, a ship passes between Old Point Comfort on the north and Fort Wool, the old Rip-Raps, on the south. Immediately thereafter, it crosses the tunnel under construction from Phoebus to Willoughby Spit. Thence the fairway runs southwesterly for nearly two miles, until the Elizabeth River channel breaks off to the

south, leading to Norfolk, and the Newport News channel breaks off to the west, leading to Newport News and the James River. Anchoring is prohibited for more than a mile east of the tunnel construction and Old Point Comfort. West of the tunnel construction and northwest of the fairway lie Temporary Anchorage A, for quarantine, customs and immigration inspections, and Naval Anchorage B. West of Naval Anchorage B and north of the Newport News channel lies General Anchorage C, and in the crotch between the Newport News channel and the Elizabeth River channel lie General Anchorages D and H.

On March 16, 1956, pursuant to a contract between The Baker-Whiteley Towing Co. and the United States, under which Baker-Whiteley undertook to provide both towage and pilotage, the tug Holland was towing the Liberty ship E. Kirby Smith from the James River laid-up fleet anchorage, bound for the Port of Baltimore. The Smith was in a laid-up status, with no machinery in operation, no charts or means for taking bearings, but with a riding crew aboard, furnished by the government and its agent, under the command of a licensed master. The captain of the tug was a licensed master and a qualified pilot for the Hampton Roads area. During the afternoon of March 16 the tug and tow encountered winds of gale force, which caused heavy seas. When they were abreast of Thimble Shoal Light, about three miles east of Old Point Comfort, the master of the tug decided it was dangerous to continue, turned around at 5:05 p.m. and headed for an anchorage in Hampton Roads.

The captain of the tug intended to anchor the Smith in General Anchorage C, but in fact anchored her in the fairway opposite Naval Anchorage B. A WNW wind was then blowing from the general direction of Newport News, with gusts up to 52 m.p.h. The Smith dropped one anchor, dragged until she dropped her other anchor, and fetched up about 400 yards from the U.S.S. Mississippi, which was anchored in Naval Anchorage

B. The Smith had about 24 fathoms of chain out on one anchor and about 90 fathoms on the other. Her true bearing from the Mississippi was about 150° to 160°, and remained constant, although the relative position of the two ships changed during the night, as they swung around when the wind shifted from WNW to N. The testimony of the tug captain that he anchored the Smith in Anchorage C and that she must have dragged anchor thereafter cannot be credited. He mistakenly thought the Mississippi was in Anchorage C; made no effort to fix the position of the Smith, although there were a number of navigational lights on which bearings could have been taken; did not use his radar to check the land contours; but contented himself with a running bearing taken while the tug was between the Smith and what he thought was buoy no. 2, headed into the gale. The weight of the credible evidence is that the Smith was anchored in the fairway from the first. The choice of anchorage was a matter of convenience and not of necessity; Anchorages C, D and H were all available.

The Smith had been showing her own kerosene running lights, and after she anchored took them down and put up her kerosene anchor lights. Shortly thereafter the tug passed up two battery-powered anchor lights. It is customary for the tug to furnish such lights, and the Holland had them aboard. The running crew on the Smith hung these lights on the tackle eyes of the davits in the bow and stern gun turrets, and took down the kerosene lights. So placed, the anchor lights were both about 15 feet above the hull (main deck), in violation of Article 11 of the Inland Rules, 33 U.S.C.A. § 180, which provides that the forward anchor light for a vessel more than 150 feet in length shall be located at a height of not less than 20 feet above the hull and that the after light shall be not less than 15 feet lower than the forward light. The riding master said that the rungs on the ladder were so rusted he was afraid to send a man up the mast to rig a line from which the lights could have been properly

suspended. If so, the United States was negligent in sending out even a hulk in that condition; if not, the riding master should have hung the lights at proper heights. Moreover, both davits were swung to port, so that each of them blocked the view of its light from a narrow wedge-shaped area, which varied as the ship swung with the wind.

The lights themselves were inadequate in two respects: (1) the filament was placed a little too high, so that at a distance of one-half mile the light would be brightest 150 feet below the horizontal plane of the filament; and at a distance of one-quarter mile, 75 feet below that plane; (2) the batteries were old; tests of similar batteries showed a sharp decrease in candle power with each day's use. The engineer of the tug jettisoned the batteries on the way to Baltimore after the collision, and doctored his log to make it appear that the batteries were new.

The lights had been manufactured by a well-known manufacturer and purchased by Baker-Whiteley from a reputable supply house.

The lights on the Smith were dimly visible to the watch on the Mississippi, who frequently looked in that direction to see whether the small boats which carried shore parties between the Mississippi and the fleet landing had resumed operations. The lights were also seen at somewhat shorter distances, by the pilot of the Alcoa Pegasus, outbound from Norfolk, and the master of the Penobscot, inbound for Norfolk, at about 0200 or a little after.

After considering all the depositions and testimony in open court, I find that both of the lights would have been visible to one keeping a sharp lookout at 500 yards, except in the two wedge-shaped areas in which the view of one or the other of the lights would have been blocked by the davit from which it was suspended. At least one light would always have been visible at all points from the course the Nyland followed, and both lights would have been visible most of the time.

The Nyland, a 408 foot, single screw, diesel powered vessel, bound for Norfolk, loaded with only 97 tons of general cargo, picked up her pilot off Cape Henry at 0140 on March 17. She proceeded at full speed, 14 knots, 12 or 13 knots over ground against the tide, until 0259, when her engines were put at slow speed to pass the tunnel construction. At 0302, having passed the tunnel work, the pilot ordered full speed ahead, although he intended to anchor among the other ships in Anchorage D, and only eight minutes later, at 0310, rang down to half ahead. Seconds later the pilot saw the Smith and ordered full astern, but the bow of the Nyland was then only 75 to 100 feet from the Smith, and crashed into her starboard side amidships, at an angle of 70° to 75°, passing halfway through the Smith.

No lookout was stationed forward on the Nyland. During the hour from 0200 to 0300, Da Silva, a seaman, had been acting as lookout on a wing of the bridge, 190 feet from the bow, while Wroblewski, another seaman, was at the helm. The pilot and the captain were on the bridge, in and out of the pilot house. About 0300, probably 0302 or 0303, Wroblewski and Da Silva reversed their duties; Da Silva took the helm, but despite the fact that they were proceeding at full speed up the fairway approaching the anchorage, Wroblewski was taken from his duties as lookout and sent below to make coffee. The anchor detail was not up; the carpenter waited for his coffee and did not go forward until a couple of minutes before the accident, and then did not look out ahead. Wroblewski returned to the bridge for a minute or two, but at 0307 he and the second officer, who had the watch, left the bridge to look for the carpenter. The second officer was making his way forward at the moment of impact. There is some confusion about where Wroblewski had been ordered to go; at any rate, he was not looking out during the important minutes before the collision. The pilot was looking out, most of the time, from the port wing of the bridge, although he

went into the pilot house at least once or twice during the eight minutes from 0302 to 0310. He did not care about a lookout; he testified that no lookout had ever reported anything to him he had not already seen. The captain no doubt looked forward from time to time, but there was no one there charged with the sole duty or even of the primary duty of looking out. For this reason, no one on the Nyland saw the Smith or her lights until the Nyland's bow was less than 100 feet away.

If a lookout on the Nyland had seen the lights on the Smith when the Nyland was 500 yards or so away, a collision could have been avoided through the exercise of ordinary care by those in charge of the Nyland.

The collision was the result of the following negligent acts chargeable to the tug, the Smith and the Nyland, respectively, all of which should be considered proximate causes of the collision:

 The tug was at fault for anchoring the Smith in a busy fairway when there were designated anchorages nearby. 33 U.S.C.A. § 409; The City of Chattanooga, 2 Cir., 79 F.2d 23, 24; The Limon (The Mayflower) 1 Cir., 35 F.2d 730. See also The Strathleven, 4 Cir., 213 F. 975, 977. Cf. The Bright, 4 Cir., 124 F.2d 45, where there were no designated anchorages. The tug was also at fault for supplying the Smith with inadequate anchor lights. By contract and custom the tug was required to furnish the lights. Even if she were not, she did supply them, and a volunteer may be held liable for damages caused by his negligence. The tug's officers were negligent in supplying lights with worn-out batteries, whether or not they were negligent in failing to discover that the strong beam of light pitched down into the water and not out in a level beam, as it should have done. The tug was at fault in failing to see that the lights were properly rigged. The captain of the tug was in charge of the flotilla; it was his duty to see that the Smith was safely anchored with proper lights showing. The Eugene F. Moran, 212 U.S. 466, 473,

29 S.Ct. 339, 53 L.Ed. 600; The Sif, 2 Cir., 266 F. 166, 168; The Printer, 9 Cir., 164 F. 314, 317. See also Curtis Bay Towing Co. of Va. v. Southern Lighterage Corp., 4 Cir., 200 F.2d 33, 34.

 Although the Smith may not be liable for the negligence of the tug in anchoring her and supplying inadequate anchor lights, see Griffin on Collision, sec. 244, The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600, the Smith herself was at fault because her lights were not properly rigged, American Dredging Co. v. Calmar S.S. Corp., D.C.E.D.Pa., 121 F.Supp. 255, affirmed 3 Cir., 218 F.2d 823; National Dredging Co. v. Monsen, 5 Cir., 126 F. 930; Griffin on Collision, secs. 99, 244. She had a riding master and a riding crew, supplied by her owner or its agent, which distinguishes this case from such cases as The Lizzie M. Walker, 4 Cir., 3 F.2d 921, relied on by proctors for the United States, owner of the Smith. If the lights could have been properly displayed, her riding master was at fault for failing to do so; if they could not have been, because no place to display them properly was left on the ship, and the rungs of the ladder had become so rusted that the riding master was afraid to send a man up the mast to rig a line, the United States was at fault for sending the hulk out in that condition. Southgate v. Eastern Transp. Co., 4 Cir., 21 F.2d 47, 49. Against a background of shore lights and the lights of other ships in the public anchorages, two lights properly displayed at different levels would have been more likely to attract the attention of the Nyland's pilot than the two level lights the Smith was showing.

 The Nyland was at fault for proceeding through the fairway at night, at 12 to 14 knots, without a proper lookout. Inland Rules, Art. 29, 33 U.S.C.A. § 221; The Ariadne, 13 Wall. 475, 478, 80 U.S. 475, 478, 20 L.Ed. 542; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; Haney v. Baltimore Steam Packet Co., 23 How. 287, 64 U.S. 287, 16 L.Ed. 562; The George H. Jones, 2 Cir., 27 F.2d 665, 667.

Although no specific location on a vessel is prescribed for the lookout, such location should be at the point best suited for the purpose of hearing and observing the approach of objects likely to be brought into collision with the vessel. The Vedamore, 4 Cir., 137 F. 844. Under the circumstances, it would have been desirable to have a lookout in the bow. Chamberlain v. Ward, 21 How. 548, 571, 62 U.S. 548, 571, 16 L.Ed. 211; The Manchioneal, 2 Cir., 243 F. 801; The Verona, 4 Cir., 65 F.2d 714; Griffin on Collision, sec. 107. But wherever he was located, he should have had no other duties. The Genesee Chief, 12 How. 443, 462, 53 U.S. 443, 462, 13 L.Ed. 1058; Chamberlain v. Ward, supra; Griffin on Collision, sec. 109. It is not safe to depend on the pilot or others on the bridge, who are charged with various important duties and responsibilities. The Richmond, D.C.E.D. Va., 275 F. 970, 973, affirmed per curiam, 4 Cir., 294 F. 90; The Orion, 1 Cir., 26 F.2d 603; The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165; Farwell, Rules of the Nautical Road (U.S. Naval Institute, Annapolis, 1954) p. 370; Le Boyteaux, The Rules of the Road at Sea, p. 220.

Each vessel claims that her fault, if any, was non-contributory, or was minor within the meaning of the Major-Minor Fault Rule. I cannot agree. It was not a minor fault to anchor the Smith in a busy fairway with inadequate lights improperly displayed. It is true that even if the lights had been proper and properly placed, they would not have been seen by a lookout who was below making or fetching coffee. But they might have been seen by the pilot or the master of the Nyland during such times as they were looking forward. On the other hand, if the Nyland had stationed a lookout near the bow, 190 feet forward of the bridge, or had kept a lookout on the wing of the bridge, charged with no other duties, I find that he would, in the exercise of ordinary care, have seen the lights on the Smith in time to have prevented the collision. The overweening self confidence of the Nyland's pilot and

the irresponsible action of her officers in sending the lookout below, were not minor faults.

### Conclusion

All three vessels were at fault and should contribute equally to the damages. Baker-Whiteley is not chargeable with any such negligence as would prevent it from limiting its liability. Since the government, as owner of the Smith, is chargeable with the negligence of its own officers and employees, it is not necessary to decide in this case whether Baker-Whiteley could limit its liability with respect to an ex contractu claim by a fault-free owner of a tow.

I will sign appropriate interlocutory decrees in the several cases.