STEPHEN O. NELSON, ELLISON BANKSMITH, HENRY C. WALKER, AND THOMAS A. NELSON, PARTNERS UNDER THE FIRM OF S. O. NELSON & CO., APPELLANTS, *v.* LUCIUS C. LELAND, JOHN H. COOKE, DUNCAN C. WILLIAMS, AND MCRAE, COFFMAN, & CO., CLAIMANTS OF THE STEAMER BRIGADIER GENERAL R. H. STOKES.

In a collision which took place between a steamboat and a flat-boat on the Yazoo river, more than two hundred miles from its mouth where it falls into the Mississippi river, both vessels were in fault—the flat-boat, because it had not one or more steady and fixed lights on one or more conspicuous parts of the boat, and because of its erroneous position in the river; and the steamboat, because the master, seeing a light ahead, did not stop his boat, and reverse her wheels, until the locality of the light was clearly ascertained.

The collision took place within the admiralty jurisdiction of the courts of the United States.

Upon a motion to dismiss an appeal, upon the ground of a want of jurisdiction originally in the District Court, the question of jurisdiction in that court is a proper one for appeal to this court, and for argument when the case is regularly reached. This court have jurisdiction on such an appeal. The motion to dismiss, upon that ground, must therefore be overruled.

THIS was an appeal from the Circuit Court of the United States for the eastern district of Louisiana, sitting in admiralty.

It was a case of collision between the steamboat Brigadier General R. H. Stokes and a flat-boat called " Clear the Track," which occurred upon the Yazoo river, 200 miles above its mouth where it empties into the Mississippi, twelve miles above Vicksburg, and wholly within the State of Mississippi. Its waters are fresh, and there are no tides in it. The libel was filed by Nelson & Co., the consignees of the flat-boat, and of 366 bales of cotton shipped on board of it.

The District Court gave judgment in favor of the libellants for the sum reported by the commissioners, viz: $7,616.44. The Circuit Court was of opinion that the exception taken to the jurisdiction of the court was well founded, annulled the decree of the District Court, and dismissed the libel with costs. The libellants appealed to this court.

At December term, 1857, *Mr. Gillet,* of counsel for the appellees, moved the court to dismiss this appeal, " upon the ground of a want of jurisdiction originally in the District Court." Upon which motion, Mr. Chief Justice Taney delivered the opinion of the court, that the question of jurisdiction in the lower court is a proper one for appeal to this court, and for argument when the case is regularly reached, and that this court have jurisdiction on such appeal. The motion to dismiss the appeal on that ground was therefore overruled.

At that term, *Mr. Gillet* and *Mr. Cushing* filed an elaborate brief against the jurisdiction of the courts of the United States in this case; but at that term the court decided the case of Jackson *v.* Steamboat Magnolia, which is reported in 20 Howard, 292. The points and authorities referred to in the brief were examined and ruled in that case, and therefore it is not necessary to state them in the present report.

The case was argued upon the facts as they appeared in evidence by *Mr. Pike* for the appellants, and *Mr. Gillet* for the appellees. Each party accused the other of negligence and want of skill in several particulars, which points would be of little interest to the general reader, and are therefore passed over.

Mr. Justice McLEAN delivered the opinion of the court.

This is an appeal in admiralty from the Circuit Court of the United States of the eastern district of Louisiana.

The libellants allege that they were the consignees of a certain flat-boat called " Clear the Track," and of three hundred and sixty-six bales of cotton, which were shipped to them by various persons by said flat-boat; that said boat left Sardinia, on Yakana river, in the State of Mississippi, on the 19th February, 1853, bound for New Orleans; that on the 2d March ensuing, on said voyage, descending the Yazoo river, about eight miles below the head of Honey Island, and within the admiralty jurisdiction, about four o'clock on the morning of said day, the flat-boat, being a stanch, tight, and well-built vessel, completely rigged and well provided with tackle, apparel, and furniture, and having on board a full complement of men to navigate the boat, being about the middle of the said Yazoo river, leaving sufficient space on either side for a steamboat or other large vessel to pass, and having a light upon the flat-boat, the captain and crew of the boat being up, the steamboat Brigadier General R. H. Stokes, ascending the said river, struck the flat-boat " Clear the Track " in the bows, which caused her to fill with water, and become a complete wreck; that the steamboat rung her bell, recognising the light of the flat-boat, but continuing to run up the middle of the river.

In their answers, the respondents say that the collision set forth in the libel occurred on the Yazoo river, about fifty miles above the foot of said island, and more than two hundred miles above the mouth of the Yazoo, where it falls into the Mississippi river; and that the entire length of the Yazoo river is within the State of Mississippi; and they allege that the District Court has not jurisdiction of the matters and things, or the claim alleged in the libel against the respondent. And the respondent denies that the collision was caused or did happen by any fault, negligence, or want of skill, in the officers or crew of the steamboat; and they say it was caused by the unskilful management of the flat-boat; and the proper place for the flat-boat, it is said, was at the shore at night; and that

there was not sufficient space for the steamboat to pass between the flat-boat and the shore.

D. B. Miller says: I have seen the flat-boat; she seemed to have a sufficient number of hands on board, and to be well managed. From the size of the boat, witness thinks she was suitable for the navigation of the Yazoo and Mississippi rivers, and from her size she would carry three hundred and fifty bales of cotton and more.

Jackson Harris is of the same opinion. James D. Bell examined the boat well, and considered her strong and well built. Saw her loaded with three hundred and forty bales of cotton, and says she would have carried fifty more bales safely. Capt. Williams was captain of the flat-boat " Clear the Track " when the collision occurred. Besides himself, he had five hands and one passenger, who also worked. Witness began his trip at Sardinia, on the Yakana river. The flat-boat had three hundred and seventy-one bales of cotton on board. Nothing of importance occurred until the morning of the second of March, 1853, when a steamer was heard coming up the river, which afterwards proved to be the Brigadier General R. H. Stokes. Witness had laid down about twelve o'clock that night, but was shortly afterwards awaked by Johnson, one of his hands, who informed him a steamboat was approaching, and he desired witness to be on deck. Witness saw the steamer approaching, at a distance of about half a mile. A light on deck was immediately prepared. At this time, the steamboat was about four or five hundred yards out of sight round the point. The witness ordered his men, four of whom were on deck at the time, to throw the boat out from the point, so as to give the steamer room to pass. Continued efforts were made for this purpose, until the collision occurred.

When the boats came together, all hands were at the oars, except Mr. Johnson, who held the light. The steamboat could be seen across the point. It was some fifteen minutes, the steamboat being in full view, before the boats came into collision. The flat-boat was struck on the first stanchion from the corner of the bow nearest the point of the nosing, about three feet from the jackstaff of the steamer. The collision was

very severe—so great as to knock every one down on the flat-boat. Witness was knocked down senseless by the crane-neck of the oar, but he saw all the others fall before he fell. When witness recovered from the effect of the blow, he perceived the steamer had passed out of his view. Every effort was made to stop the hole made in the flat-boat by the steamer, and, by working the pump, to keep the boat from sinking. The boat floated down some twenty-five miles before they could land her. In less than an hour after the collision, the boat sank six feet deeper in the water, and became unmanageable; and a landing was made, with great difficulty, at some three or four o'clock in the afternoon.

The steamer Stacey came down the river the next day, and she took on two hundred bales of the cotton, including the thirty-five on shore. Before the arrival of the Stacey, witness had engaged the steamboat McLean to go up and take up the cotton that could be saved.

Witness has been engaged in flat-boating on the Yazoo river for the last eighteen years. He does not consider the place where the collision happened as unsafe to run a flat-boat at night, and that it is not usual to tie up flat-boats in that part of the river.

The witness says the flat-boat had a torch made of split pine boards, as usual on such occasions. The Stacey met the flat-boat in a very narrow part of the river, much narrower than where the flat-boat met the Stokes. The Stacey was much nearer the flat-boat when she rang her bell than the Stokes, but she backed out of the way. The Stacey is double the size of the Stokes, it being the largest boat that runs up the Yazoo.

Mr. Johnson is corroborated by others in his statement. Thomas Barnes says the steamer did not change her course after seeing the flat-boat. The steamer was not hurt. Her jackstaff was knocked off, which was replaced. Did not hear Captain Williams offer any assistance to the flat-boat. At the time the steamer struck the flat-boat, she was nearly in full headway.

Witness thinks there was time enough for the steamer to

get out of the way of the flat-boat. The master of the boat entered a regular protest against the steamer. A number of witnesses referred to facts which have no material bearing in the case.

On the part of the respondent, it was proved by William F. Mouldin, the pilot on the Yazoo since 1845, and was so acting on the Stokes when the collision occurred, eight miles from the head of Honey Island : The bell was rung to stop at Hall's Landing. Directly after ringing the large bell to land, saw a light, as he supposed, at the landing. The river was narrow and the current swift. After running a short distance, and rounding the point, saw the flat-boat about three hundred yards above the steamer. He immediately rang the bell to stop the engines, and then to back her, which was done. When she had made about six revolutions, the collision took place. The steamboat was nearly at a stand. The flat-boat was floating nearly broadside down the river. There was no possible means by which a collision could be avoided. The steamboat could not pass on either side of the flat-boat. This, however, is controverted by other witnesses, who say that there was space on each side of the flat-boat for the steamer to pass up the river.

That the light on the flat-boat was seen some two or three hundred yards by the steamer approaching the flat-boat, is admitted ; but it is urged that a steady light should have appeared on the flat-boat; that a waving lighted torch often misleads an ascending boat, on the supposition that it is on shore, and designates a landing-place. Several of the witnesses say, that on observing the approach of the flat-boat, the wheel of the steamer was reversed, and some five or six revolutions had been performed when the collision occurred. Some of the witnesses think that the force of the steamer was checked, so that its movement up the river could scarcely be perceived when the steamer struck the flat-boat.

It has happened in this case, as in all other cases of collision, that the witnesses on board of their respective boats, from the circumstances which surrounded them, and the favorable impressions naturally felt in regard to the efforts made by their.

respective crews to save the property and lives under their charge, differ widely in their opinions. The steamboat received but little or no injury by the collision; but the flat-boat, in its structure and cargo, received material injury. The evidence fully proves this, not only in regard to the flat-boat and cargo, but also as to the expense and loss to which the owner was subjected.

It is unnecessary to go into detail to show the facts proved. It is enough to know the character of the transaction, and the responsibilities incurred by the respective parties.

The general rule is, where two vessels meet each other, one propelled by steam and the other by the winds, the steamer must give way, and avoid a collision. To this no one can object; but, like other general rules, it may be subject to exceptions.

The Yazoo extends, from its junction with the Mississippi river, some two hundred miles and upwards into the State of Mississippi, and in some parts its navigation requires care and experience. Its channel widens and deepens as the volume of water increases; but it is a narrow river, and its course is crooked—but the Stacey and other boats, of a large class for inland boats, navigate it with success.

Several of the steamboat witnesses think that a flat-boat, laden with three hundred and seventy bales of cotton, ought not to run on a dark night, but should be tied up, where the channel is narrow, and have fixed lights, which distinguish it from a place of landing. Other witnesses differ from the above, and say that an inland navigation so long and important as this, ought to be left free to the enterprise of its inhabitants. This is more congenial to the spirit of our people than a regulation which would retard commerce, without any adequate beneficial results. No measure of this character could well be adopted, without an accurate survey of the river, in which the points of danger should be designated. Until this shall be done, it would seem most judicious not to go beyond a regulation for boats, passing each other in ascending and descending this river, having lights, and giving notice of their approach. There are regulations which apply to our internal

navigation, embracing our rivers and other waters. Under these, every master of a boat should act with a presumed knowledge of his duty, and be held responsible accordingly.

We think, in several particulars, the captain of the flat-boat was in fault. He should have had one or more steady and fixed lights on one or more conspicuous parts of his boat. He should have been careful, by having the upper and lower end sweeps or oars so worked as to have occupied near the shore of the river, giving a sufficient passage to the ascending steamboat. Especially he should have so guided his boat as to have kept it on a straight line of the water, and not on a diagonal course. It is easily perceived that, from the position of the flat-boat, it was difficult, if not impracticable, to ascend the river by the steamer without striking the flat-boat, in the position it occupied.

But we think there was also fault in the steamer. In rounding the point, it is admitted, the steamer was at least three hundred yards below the flat-boat. Seeing the light ahead, the master, in the use of ordinary caution, should have stopped his boat at once, and reversed her wheels, until the locality of the light was clearly ascertained. It is no excuse, that he mistook the light for a place of landing. The commander cannot lessen his responsibility by alleging his mistake. He is bound to make no mistake, for it is his duty to stop his boat where he doubts, until he ascertains the facts. Had this been done, the collision could not have occurred. He could have backed his boat, until he avoided the flat-boat. In not having done this, the steamer was in fault, and the damages must be divided between the two boats, and also the costs.

Some doubts have been suggested whether, in the exercise of the admiralty jurisdiction, some limit may not be interposed.

Under the English system, the ebb and flow of the tide, with few if any exceptions, established the fact of navigability; and this was the course of decision in this country, until recently.

The vast extent of our fertile country, its increasing commerce, its inland seas, bays, and rivers, open to us a commer-

cial prosperity in the future which no nation ever enjoyed. Our contracted views of the English admiralty, which was limited by the ebb and flow of the tide, were discarded, and the more liberal principles of the civil law, equally embraced by the Constitution, were adopted.

This law is commercial in its character, and applies to all navigable waters, except to a commerce exclusively within a State. Many of our leading rivers are sometimes unnavigable; but this cannot affect their navigability at other times. A commerce carried on between two or more States is subject to the laws and regulations of Congress, and to the admiralty jurisdiction.

Upon the whole, the decree of the Circuit Court is reversed; and the cause is remanded, under the above order of this Court.

Mr. Justice CAMPBELL dissented, and Mr. Justice CATRON concurred for the reason stated by him.

Mr. Justice CAMPBELL dissenting:

The decree in the Circuit Court, dismissing the libel in this cause, was rendered before the judgment in this court in the case of Jackson *v.* Magnolia, 20 How., 292, was given. There is no material difference in the cases. The reasons for the judgment of the Circuit Court in this case are contained in the opinion filed by me in that case. I do not consider it necessary or proper to repeat them here. I concur in the judgment of the court upon the merits of the cause.

Mr. Justice CATRON concurs with the opinion of the court, because the question of jurisdiction, involved in this cause, was ruled in the case of the Magnolia, referred to by Mr. Justice Campbell.