## THE LAURETTA SPEDDIN.

(Circuit Court of Appeals, Fourth Circuit. November 10, 1910.)

### No. 901.

**1. COLLISION (§ 17\*)—FAULT—OBEDIENCE TO RULES.**

Obedience to the rules of navigation is not a fault, even if a different course would have prevented a collision, and the necessity must be clear and the emergency sudden and alarming before an act of disobedience can be excused.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 16; Dec. Dig. § 17.\*]

**2. COLLISION (§ 45\*)—STEAM AND SAILING VESSELS MEETING—FAILURE OF STEAM VESSEL TO KEEP OUT OF THE WAY.**

A collision occurred in the daytime in calm weather between a small sailing vessel known as a "bugeye" sailing down the Patapsco river in a southeasterly direction, with a 14-mile northeast wind, and an empty scow in tow of a tug on a 300-foot hawser passing up. At the time of collision the tug was to the eastward of the bugeye, and there were no other vessels in the vicinity, which left ample room for safe navigation. *Held*, that the case was governed by articles 20 and 21 of the inland rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which required the tug to keep out of the way and the sailing vessel to keep her course and speed; that, under the evidence, the latter complied with such rules and that the fault was solely that of the tug which, if she did not cross the course of the other vessel as claimed, failed to give sufficient room to allow for the tailing of the scow to leeward.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. § 45.\*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

**3. SHIPPING (§ 63\*)—INTOXICATION OF MASTER.**

Intoxication of master. Such charge presents a grave question. Only sober persons should be placed in charge of, or allowed to navigate or take part in the navigation of, vessels plying the seas or other navigable waters; and too much care cannot well be adopted in prescribing and enforcing rules intending to bring about such result, or make such condition impossible, or at least exceedingly improbable.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 63.\*]

Appeal from the District Court of the United States for the District of Maryland, at Baltimore.

Suit in admiralty by Robert L. Rogers, individually and as owner of the bugeye, Nettie Allinnson, against the steam tug Lauretta Speddin. Decree for libelant, and claimant appeals. Affirmed.

Frederick Dallam, for appellant.

Milton Roberts, for appellee.

Before PRITCHARD, Circuit Judge, and WADDILL and CONNOR, District Judges.

WADDILL, District Judge. This is an appeal from a decree of the United States District Court for the District of Maryland rendered on the 27th day of January, 1909, in a libel filed by the appellee against the appellant, and a cross-libel filed by the appellant against the appellee;

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

said two cases being heard together, by which decree the lower court dismissed the cross-libel, and adjudged in favor of the libelant, the appellee herein. The case involved a collision between a small sailing vessel, known as a "bugeye," and an empty scow in tow of the steam tug Lauretta Speddin, which occurred about 9 o'clock on the morning of July 31, 1908, in Patapsco river, about half way between the entrance of the Baltimore harbor and Ft. Carroll. The facts are thus accurately summarised in the opinion of Judge Morris of the lower court:

"The bugeye was proceeding on a southeast course down the river, having up her mainsail, foresail, and jib, with a fresh 14-mile breeze from the northeast. Her master was at the wheel, and two colored sailors forward. The case for the sailing vessel is: That, when she had cleared the harbor, she saw the tug and tow to the leeward about a mile and a half to two miles off. That the sailing vessel kept her course, but the tug in approaching crossed the course of the sailing vessel from the sailing vessel's starboard to port, and the scow, being about 300 feet behind tug and more to the leeward, collided with the sailing vessel. That the master of the sailing vessel, when he saw that a collision with the scow was imminent, put his wheel to port, and let her main sheet run off bringing the sailing vessel's head to the starboard and before the wind and nearly clearing the scow, but they came together, the sailing vessel striking head on near the corner of the scow with such violence that the bugeye sank and her master was injured. The case for the tug made by the answer is: That, while the tug was coming up the river with the empty scow on a 50-fathom hawser, they saw the bugeye approaching under full sail coming rapidly down the river on a course parallel to the course of the tug and about 250 feet to the westward. That when the bugeye was nearly abreast of the tug, and about 250 feet to the port side of the tug, the master of the bugeye put his wheel to starboard, and began to haul down her mainsail, and the bugeye began to luff to her port. That the tug blew warning whistles, and the master of the bugeye, seeming to see the scow, put his wheel to port and threw the head of the bugeye to starboard and collided with the scow, bows on."

The officers and crews of the two vessels were examined as witnesses before the court, and there was the same conflict between them that is presented in the pleadings between the parties, except the testimony of the scowman, and steward on the tug, tends to support the claim of those on board the bugeye, as to her navigation; that is, that without changing her course, except to lighten the lick of the collision, she continued straight forward, head on, into the scow. The contention of the parties thus set up in their pleading, and maintained by the testimony introduced by them, respectively, involves the application of the rules under which they were severally navigating, and being between a sailing vessel and a steam vessel, the rules respecting the passing of such vessels, namely, articles 20 and 21 of the rules of navigation (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), apply, unless there is something peculiar to their situation that excused them from their operation. These rules provide that, when steam and sailing vessels are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel, and imposes upon the latter the obligation to keep her course and speed. The sailing vessel in this instance insists that this rule was strictly observed on her part, and says that although the vessels were in full view of each other for some two miles, and the tug sighted by her to leeward at that distance, that the latter crossed her course from starboard to

port, and that the scow 300 feet behind the tug tailing to the leeward collided with the sailing vessel. The tug admits seeing the sailing vessel at the distance indicated, but insists that she was proceeding rapidly down the river on a course parallel to that of the tug, that the latter was never to the leeward at all, but was to the windward—that is, on the port side of the bugeye, and eastward of the channel—and continued to so navigate until the bugeye was nearly abreast of the tug, and about 250 feet on her port when the navigator of the bugeye suddenly starboarded his wheel, began to haul down his mainsail, causing the bugeye to luff to port, whereupon the tug immediately sounded danger signals, causing the master of the bugeye to put his wheel to port, and throw the head of the bugeye to starboard, and to run into and collide with the scow.

The defense interposed on the part of the tug and burdened vessel briefly is that seeing a sailing vessel a mile and a half to two miles away, not crossing, but running on practically parallel courses, she continued her course, as did the sailing vessel, allowing a berth of 250 feet, until the latter vessel, which was only required to keep her course and speed, arrived at a point opposite the tug, suddenly luffed up into the wind and ran into the scow. The improbability of this defense was called attention to by the judge of the lower court in his opinion, and its unreasonableness is so apparent that the court ought not to adopt it in the absence of some circumstance tending strongly to support it, unless the testimony clearly establishes the same. It is what burdened vessels have frequently sought to do, but by reason of the inherent weakness of the contention it has rarely been accepted by the admiralty courts. It should not be lightly assumed that men who follow the sea, and whose duty it is to obey and respect rules of navigation, will expressly run counter to them, when to do so involves serious loss and risk to themselves. We think the statement of Mr. Justice Grier, speaking for the Supreme Court of the United States, aptly characterises this defense:

"This is the stereotyped excuse usually resorted to for the purpose of justifying a careless collision. It is always improbable, and generally false."

And proceeding further said:

"The hypothesis set forth in the answer to excuse this collision, that the boats were passing on parallel lines, 300 yards apart, and that, when within 100 or 150 yards of passing each other, the schooner turned round and ran herself under the bows of the steamer, is not only grossly improbable in itself, but contradicted by the testimony, and is a mathematical impossibility." Haney v. Baltimore S. P. Co., 23 How. (64 U. S.) 287, 291, 293, 16 L. Ed. 562.

There is a conflict in this case, it is true, as to the sailing vessel suddenly luffing and bringing about the collision, though we think that two of the witnesses for the respondent go far to support the sailing vessel's theory that she continued on her course, without change, until the actual giving of the danger signals. But here, as in the Haney Case, 23 How. 293, 16 L. Ed. 562, supra, it was in effect a nautical impossibility for the collision to have occurred as contended for by the tug. If the tug was proceeding to windward of the sailing vessel, and the latter 250 feet distant from her, the sailing vessel, by luffing, would have

been thrown into the wind, and brought practically to a standstill, instead of to have continued on her course, as is contended here, bringing about the collision. We entirely agree with the learned judge of the court below that "it is much more probable that the strong 14-mile breeze from the north and east, acting upon the empty scow at the end of a 50-fathom hawser, caused the scow to sag over to the westward and across the course of the bugeye, and that its sagging was not observed by those on the tug," particularly in view of the testimony of the tug's master, that the scow was tailing off of his course the length of the scow, which was some 90 feet. All that was required of the sailing vessel in this case was to keep her course and speed; whereas on the tug was imposed the burden of not only avoiding the collision, but the risk of collision. Upon her own showing, for she admits having proceeded straight ahead, she should have allowed ample room to the sailing vessel, so as to avoid an accident arising from sudden, unforeseen, and unanticipated whims of navigation, as claimed by her to have been the case on the part of the bugeye, especially as there was plenty of space, and no weather conditions or other causes to prevent her from so doing.

Counsel for appellant earnestly insists that the ordinary passing rules above referred to governing sail and steam vessels do not apply to this case, but that article 29, known as the "Special Circumstance" rule does, and the defense, as well as arguments of counsel, is largely predicated upon this theory. We cannot accept that view of this case. There are undoubtedly situations in which the circumstances are such that the vessel having the right of way has to look out for the burdened vessel, but they are exceptional, and clearly do not apply to a case like this, where the two craft in collision are the only shipping present, in a river of the width of the one here, and where neither in the weather conditions, or otherwise was there anything exceptional calling for a change or modification of the general rules of navigation. One vessel was proceeding at the rate of some 4½ miles an hour, and the other 8 or 10, with a good breeze, it is true, but one of only 14 miles an hour, which presented in those waters no unusual condition. It occurred in broad daylight in good weather, and the master of the tug should have anticipated the speed at which such a breeze would move the bugeye, and have governed himself accordingly.

The rules of navigation should not be lightly departed from. "Obedience to the rules is not a fault, even if a different course would have prevented a collision, and the necessity must be clear and the emergency sudden and alarming before an act of disobedience can be excused." Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218.

The cases cited by the appellant will, upon careful examination, be found not to support his view as to what rules should govern the navigation in these circumstances. The Marion W. Page (D. C.) 36 Fed. 329, was a case of a sailing vessel with a free wind, meeting a steam propeller with a tow of five barges. After safely passing the propeller and three barges, the schooner attempted to cut across between the fourth and fifth barge and brought about the disaster. It occurred in

the early morning, with the propeller and tow meeting four sailing vessels, two on each side. The Minnie C. Taylor (D. C.) 52 Fed. 323, was a case of a collision at night between the Taylor, while tacking, encountering a tug, having two barges in tow, on long hawsers of some one hundred and one hundred and twenty-five fathoms each, and another sailing vessel, and in a channel of less than three-fourths of a mile wide. The Rose Culkin (D. C.) 52 Fed. 328, was a collision in a busy harbor, between a schooner and a tug, during a gale, near to an anchored barge, and in the presence of another barge, moving under the influence of the storm.

In the answer of the tug and in the cross-libel the further claim is made that the bugeye, and not the tug, should be held responsible for the collision, because the master of the bugeye was incapacitated from drink to safely navigate his vessel. This, of course, presents a serious question, and has given us much concern, because of the gravity of the charge, as, manifestly, only sober persons should be placed in charge of, or allowed to navigate, or take part in the navigation of vessels plying the seas, or other navigable waters; and too much care cannot well be adopted in prescribing and enforcing rules intended to bring about such result, or make such condition impossible, or at least exceedingly improbable. Upon this question much testimony was adduced, some of it very strong as to the bugeye's master sometimes drinking to excess. We cannot say, however, that the same was sufficient to maintain the charge of his drinking on the occasion of this occurrence, or that his habits had anything to do with the collision. On the contrary, we do not think they had, and that the collision is otherwise readily accounted for. This was the conclusion of the trial court, presided over by District Judge Morris, whose well-recognized ability and long experience as an admiralty judge entitles his judgment to much weight respecting an unusual and delicate question of this character. He saw and heard the witnesses testify, doubtless knew many of them, and could the better determine, from their manner, appearance, and deportment on the stand, the weight that should be given to their several statements. He also was entirely familiar with the river at the scene of the collision, and the local customs, if any, of those navigating the same, and we are unwilling to disturb his findings of fact, regarding either the condition of the captain of the bugeye, at the time of the collision, or the effect that the same had upon the occurrence, if any.

The judgment of the lower court will be affirmed.