NEW YORK, P. & N. R. CO. v. WILKINS et al. THE N. Y., P. & N. BARGE NO. 4. THE DELMAR.

(Circuit Court of Appeals, Fourth Circuit. January 20, 1919.)

No. 1641.

COLLISION ⬅➡104—FAULT—BURDEN OF PROOF—VIOLATION OF HARBOR RULES.
A tug leaving the port of Norfolk, with a tow exceeding by 300 feet the length prescribed by the harbor regulations, *held* to have the burden of showing that such violation did not cause or contribute to a collision' in Elizabeth river between the tow and another vessel.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in admiralty by Lillie Wilkins, administratrix of the estate of Alexander Wilkins, deceased, and others, against the tug Delmar and the N. Y., P. & N. Barge No. 4; the New York, Philadelphia & Norfolk Railroad Company, claimant. Decree for libelants, and claimant appeals. Affirmed.

For opinion below, see 248 Fed. 823.

Floyd Hughes, of Norfolk, Va. (Thomas H. Willcox and Hughes & Vandeventer, all of Norfolk, Va., on the brief), for appellant.

John W. Oast, Jr., and R. T. Thorp, both of Norfolk, Va., for appellees.

Before PRITCHARD and KNAPP, Circuit Judges, and CONNOR, District Judge.

PRITCHARD, Circuit Judge. This libel was filed to recover for loss of life of Alexander Wilkins, on the 29th day of October, 1916, about 6 o'clock p. m., caused by a collision at a point northerly of and in the vicinity of the can buoy at the entrance to the West Norfolk channel from the main channel of the Elizabeth river, Norfolk, Va., between an unnamed gasoline launch, in which the deceased, Edward Bishop, Elizabeth H. Simmons, and Lubertia Howell were at the time, and barge No. 4, with 28 loaded railroad freight cars on board, in tow of the tug Delmar, whereby the launch was capsized and lost, and the four persons on board drowned, and is an appeal to this court from the District Court of the United States for the Eastern District of Virginia, at Norfolk. Administrators for the three persons named, other than the libelant, filed their petitions in said libel case under the rule.

The gasoline launch was about 30 feet long, 6 feet broad, 3½ feet deep, with a wooden house or cabin extending from a point about 6 feet abaft the stem and extending aft to a point about 6 feet from the stern, and at the time of the accident was in charge of Wilkins, her owner and master, and Bishop was acting as engineer. Barge No. 4, designed for the transportation of railroad freight cars between Norfolk and Cape Charles, is 340 feet long, 50 feet broad, and 1,174 tons net register, and was being towed on a hawser of some 80 or

90 fathoms long, by the steam tug Delmar, 112.3 feet long, 26.9 feet broad, and 11.7 feet deep, and 130 tons net register, 240 tons gross.

The libelant alleges that on the date named the launch was proceeding at about 6 miles an hour, up the Elizabeth river to the westward of the channel, bound for Norfolk, the course of the launch being in a general southeasterly direction, parallel to the main channel extending between Lambert's Point and Pinner's Point; and the Delmar, with the barge in tow, was proceeding from the N. Y., P. & N. terminal at Port Norfolk, bound for Cape Charles. As the tug proceeded out of the West Norfolk channel, and began to shape her course for the northward, the launch stopped her engines, and waited for the barge to follow the tug; but, instead of doing so, it made a shorter turn than the tug, and took a course to the westward of the can buoy at the entrance of the West Norfolk channel, heading in the direction of said launch, which was drifting under the influence of a strong flood tide. The launch immediately proceeded to back to avoid the barge; but the latter swung in towards the launch faster than the launch could get away, so that the cable from the barge to the tug caught the bow of the launch, tipping it over on its port side, where it lay until the forward part of the barge struck it, and carried it under water, drowning all on board, and the launch was a total loss. At the time of the collision the weather was cloudy and calm, and the tide flood.

The libelant charges the following faults against the Delmar: That she was navigating in the harbor with a tow which, including the length of the Delmar, exceeded the length of 700 feet, contrary to the harbor regulations, the hawser being 540 feet long; that she was not manned by a competent master and crew; that she was navigated without a competent lookout properly stationed and attending to his duties; that she was proceeding at an illegal rate of speed, and on the west side of the channel, and that she did not observe the launch lying to the westward of the channel, and the course of her tow, in time to take precautions against running down the launch; and further charges as faults against the barge that it was not managed by a competent master and crew; that it did not have a competent lookout, properly stationed and attending to his duties; in that it was part of a tow which including the length of the Delmar, exceeded 700 feet, and navigated in the harbor of Norfolk; that it did not follow the course of the Delmar, but steered to the port and to the westward of the can buoy at the entrance of the West Norfolk channel, and thereby without warning ran down the launch, which was waiting for it to pass on the course of the tugboat; and that, when the collision became imminent, the towing hawser was not turned loose from the barge, as it easily could have been.

The respondent admits collision with a gasoline launch at about the time stated in the libel, but contends that it occurred in the main channel of the Elizabeth river, nearly opposite black spar buoy No. 11 and denies generally the facts relating to the collision as alleged in the libel, and particularly charges that the launch, before and when it passed the Delmar, was proceeding up the river on the extreme eastern

edge of the channel, the Delmar at the time proceeding out of the West Norfolk channel, and shaping her course to the northward, so as to keep to the starboard side of the main ship channel, after passing Lambert's Point piers. It also denies that the barge did not follow the tug, or that it headed in the direction of the launch, or that the launch was drifting under the influence of a strong flood tide, and alleges that the tug, proceeding down the channel on her usual and proper course, with the barge following in her wake, passed the launch starboard to starboard, when about opposite the merchandise piers at Lambert's Point, the launch at that time being several hundred feet to the eastward of the tug, and well over on the eastern side of the main ship channel, the launch and tug having interchanged "salute" whistles, when about abreast of each other. Shortly afterwards the tug heard distress signals from the barge, and then observed that the launch had suddenly and unexpectedly and without warning changed her course in the wake of the tug; that the bow of the launch struck the forward end of the barge and immediately sank; that nothing could have been done, either on the part of the tug or, the barge to avoid the collision, and no other maneuver was possible; save to stop the tug's engine, which was done.

Respondent also charges that the launch was at no time on the port side of the tug or barge, but, on the contrary, that she was far to starboard; that the launch was navigated by unskillful, unlicensed, and negligent navigators; that she was not in charge of an experienced and careful master; that she had no efficient lookout properly stationed; and, further, that the decedent, Wilkins, being master of and in charge of the launch's navigation, was guilty of negligence contributing to the collision, which is a bar to a recovery by his administratrix herein.

The court below entered a decree awarding $7,500 damages for the loss of the life, of Wilkins, $600 for the loss of the launch, $4,500 for the loss of the life of Edward Bishop, and $1,500 each for the loss of the lives of Elizabeth H. Simmons and Lubertia Howell. The court below, among other things, found as a fact that—

"The tow, as well as the hawser in use at the time of the collision, were both greater in length than prescribed by the state and federal statutes. The tug was 129 feet long, the hawser 90 fathoms, or 540 feet, and the barge 340 feet, making more than 1,000 feet for the entire tow, which exceeded the local regulations by 300 feet, and the hawser 15 fathoms, or 90 feet, longer than allowed by the federal statutes."

It appears that the waters between the port of Norfolk and the terminal at Cape Charles consist of narrow channels and anchorages, more or less dangerous at all times, and extremely so when a tug with a tow leaves either one or the other of the terminals mentioned with a 540-foot tow line, and required to traverse a circuitous course.

Counsel for the appellant insist that this rule only applies to seagoing barges—

"and the department that promulgated these regulations ruled on January 25, 1909, six days prior to the regulations taking effect, that these barges were not seagoing barges subject to such regulation, a fact which has been before the court in all the cases in which these car floats have been involved."

Regulations promulgated pursuant to Act Cong. May 28, 1908, c. 212, 35 Stat. 428, require hawsers or tows of seagoing barges navigating the inland waters of the United States to be limited in length to 75 fathoms, and should in all cases be as much shorter as the weather or sea will permit. Section 18 of the harbor regulations also provides that "no tows exceeding 700 feet in length shall enter or depart from the harbor." It is probable that these regulations were adopted in view of the fact that only seagoing barges under the act of Congress were affected thereby. The act of Congress, standing alone, could not be invoked in a case like the one at bar. Hence we have the harbor regulations which apply to tows, either seagoing or otherwise, and prohibit any tow exceeding 700 feet in length to enter or depart from the harbor.

Indeed, the contention of counsel for appellant is based upon the theory that vessels passing through these dangerous channels may do so at will with any length of hawser, without considering any risk that may be incurred thereby. The master of the Delmar, who was a witness in the court below, clearly indicated as much by the following question and answer:

"Q. Don't you pay any attention to the regulations of the harbor master, which provide you shall not proceed south of Sewall's Point, with a tow exceeding 700 feet in length? A. We always go out longer than that I suppose."

This condition, if conceded, does not relieve the tows entering the harbor from the duty of conforming to the rules, and the court below having found as a fact that the tow exceeded the length prescribed by the port rules casts upon the tow the burden of showing that such violation did not contribute to the injury, and this has not been done in this instance. In the case of The Pennsylvania, 19 Wall. 125–136 (22 L. Ed. 148), the court, in referring to this point, said:

"But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute. In the case of The Fenham, 23 Law Times, 329, the Lords of the Privy Council said: 'It is of the greatest possible importance, having regard to the admiralty regulations, and to the necessity of enforcing obedience to them, to lay down this rule: that if it is proved that any vessel has not shown lights, the burden lies on her to show that her noncompliance with the regulations was not the cause of the collision.' "

Also in the case of Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291–298, 37 Sup. Ct. 270, 61 L. E. 726, the Supreme Court quotes with approval the foregoing.

There are a number of other decisions of the Supreme Court to the same effect, notably Belden v. Chase, 150 U. S. 674, 698, 14 Sup. Ct. 264, 37 L. Ed. 1218, and Richelieu & Navigation Co. v. Boston Ins. Co., 136 U. S. 408, 10 Sup. Ct. 934, 34 L. Ed. 398.

Having carefully considered the other assignments of error, we are of opinion that they are without merit.

For the reasons stated herein, the decree of the lower court is affirmed.