## THE MANAWAY.

## THE G. S. ALLYN.

(District Court, E. D. Virginia. March 18, 1919.)

COLLISION ⬡═45—STEAM AND SAILING VESSELS—FAULT.

 A fishing steamer *held* solely in fault for collision with a meeting schooner at night on Chesapeake Bay, for not sooner seeing the schooner's lights and for proceeding without reducing speed after the schooner was seen 150 yards away, instead of stopping and reversing at once, which, as the burdened vessel, she should have done.

In Admiralty. Suit for collision by M. H. Lumpkin, master of the schooner Manaway, against the fishing steamship G. S. Allyn. Decree for libelant.

Frank Newbill, of Irvington, Va., and John N. Sebrell, of Norfolk, Va., for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge. On the morning of the 14th of September, 1918, between 3:30 and 4 o'clock, the schooner Manaway and the fishing steamer G. S. Allyn were in collision in the waters of Chesapeake Bay, about a mile and a half off and to the northward of Windmill Point Light, with the result that in about 15 or 20 minutes the schooner sank, and its cargo and the belongings of all on board proved a total loss, to recover the value of which this libel was filed.

The Manaway was a two-masted schooner, 63 tons gross, 68.5 feet long, 23 feet beam, 5.8 feet deep; the Allyn was a steamship used in the fishing service, 150 feet long, 24 feet beam. At the time of the collision, the Allyn was proceeding up Chesapeake Bay, returning from the fishing grounds at sea, to her owner's factory at Fleeton, Va., having on board her crew and some 25 fishermen. The Manaway was proceeding down the bay to Rappahannock river, Va., laden with a cargo of cans and can cases.

The assignments of fault by the vessels, one against the other, are numerous; but, in the view taken by the court, the testimony of those material are whether the lights of the sailing vessel, before and at the time of the collision, were properly set and burning, and should have been timely seen by the steamer, and also whether the steamer, after observing the schooner, conducted her navigation with seamanlike skill and promptness.

The court's conclusion, upon a review of all the testimony, is that the sailing vessel had up the regulation lights, and that the same were properly set and burning. Her officers and crew, one and all, so testify, and that the lights had been burning during the night, and were set and burning as the schooner went down. The positiveness and clearness of this testimony, in the light of knowledge and opportunity of knowledge of those testifying, ought not to be lightly ignored, because those engaged in the navigation of the steamship failed to see the lights.

⬡═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The navigation of the steamship was in charge of a private pilot and a wheelsman, both in the pilot house, and a fireman, who was below. The master had turned in, as had the others of the ship's crew, and there was no one person charged especially with the performance of the duties of the lookout; the same having been intrusted to those in the pilot house. No lights were observed on the schooner by those on the steamship, and its presence was first known when it loomed up about a point on the steamship's starboard. The pilot, in the pilot house, admits seeing her 150 yards away, and the wheelsman, also in the pilot house, 75 yards away. The fireman, the only other person on duty at the time, was not examined. The evidence shows that the first order was to starboard the wheel, then hard astarboard and stop and reverse, and that there was about two minutes between the time of observing the loom of the schooner and the happening of the collision.

The steamship was the burdened vessel, and the one against whom presumptions of fault, if any, are to be solved. She was charged, not only with avoiding collision, but the risk thereof, with this sailing vessel (article 20, Inland Rules of Navigation), and it was incumbent on her not to take chances. The danger of collision was sufficiently present when the schooner, whose course was unascertained, was observed 150 yards away, to admonish the steamship to take no chances. Observing the loom of the schooner within that close proximity on the steamship's starboard, her navigator should have immediately stopped and reversed, giving the appropriate signals to that end, and to have first starboarded, without slackening speed, and then hard astarboarded before stopping and reversing, was a manifest and gross fault of navigation, sufficient in itself to account for, and in the judgment of the court did bring about, the collision. The rules of navigation for preventing collisions at sea (article 23) impose on steamers, in the presence of impending danger, the duty to slacken speed, or stop or reverse, if necessary, and means that such precaution shall be timely taken, and to delay action in that respect, or fail promptly and seasonably to take the necessary steps to avoid risk of collision, must be at the peril of the steamship. Nelson v. The Leland, 22 How. 48, 55, 16 L. Ed. 269; The New York, 175 U. S. 187, 201, 22 Sup. Ct. 67, 44 L. Ed. 126; The State of Alabama (D. C.) 17 Fed. 847, 853, and cases cited.

The steamship in this case is moreover at fault for her failure to see the lights of the sailing vessel earlier, as they were manifestly burning, and ought to have been observed by those in charge of the navigation of the ship, in the exercise of due care on their part. The navigators of the schooner testified that they observed the masthead light of the steamship two miles away, and thereafter steadily maintained the schooner's course and speed.

The libelant further insists that the steamer was at fault for her failure to have a proper lookout, and that she was also reprehensible for her omission to stand by the schooner after the disaster. There is great force in the contention in both respects, and much testimony to support the same; still the court does not feel that it is necessary to rest its decision upon either of these points. The schooner was seen in am-

ple time to have avoided the collision by the exercise of good seamanship by those in charge of the steamship. The court, however, feels that it should say, as respects the failure to have a lookout other than the two persons stationed in the pilot house, that the navigation, in the nighttime, of a vessel of the size in question, on a frequented thoroughfare like Chesapeake Bay, having aboard a large number of persons, without the presence of one whose sole duty it was to act as lookout, without other duties to distract his attention, was of doubtful propriety.

Regarding the charge against the steamship of failure to stand by after the collision, the court is not inclined, in the light of the testimony, to hold that the steamship wholly failed to discharge its duty in that respect. Still it does appear, considering the seriousness of the collision, that something more should have been done than was. Providentially, the lives of all on board the sinking schooner were saved, but not due to anything that the steamship did.

A decree holding the steamship wholly responsible for the collision will be entered on presentation.