## THE RICHMOND. THE HAWARDEN. NEW v. UNITED STATES.

(District Court, E. D. Virginia.　October 21, 1921.)

1. **Collision 🔑91—Held fault of steamer.**

　　Where steamer, proceeding down a river at seven knots an hour without a lookout, collided with schooner coming up the river, *held*, the steamer was solely responsible for collision, in view of Inland Rules of Navigation, arts. 20, 21, 22, 23, 27, 29 (Comp. St. §§ 7859–7862, 7866, 7868).

2. **Evidence 🔑77(5)—Failure to produce members of crew as witnesses may be considered.**

　　In a collision case, the failure of a ship to produce members of her crew, who could or should have been able to throw light on the case of the collision, is noteworthy.

In Admiralty.　Libel by George H. New, master of the schooner Richmond, against the United States, owner of the steamship Hawarden.　Decree for libelant.

Baird, White & Lanning, of Norfolk, Va., for libelant.
D. Lawrence Groner, U. S. Atty., of Norfolk, Va.

WADDILL, Circuit Judge.　The libel in this case was filed to recover damages sustained in a collision between the schooner Richmond and the steamship Hawarden, which occurred about 2:15 o'clock on the evening of the 26th of June, 1920, in the Elizabeth river, Norfolk, Va., at a point approximately midway between the Norfolk & Western Railway coal piers at Lambert's Point, and the Engineer pier at the Army Supply Base, above Lambert's Point.　The schooner was a three-masted vessel, 155 feet long, 26 feet 6 inches beam, and 9 feet deep, heavily laden, and the Hawarden a large steamship, owned by the United States, 416 feet long, 53 feet beam, and 9,400 tons dead weight capacity, partially loaded with some 200 tons of cargo.　At the time of the collision, the Richmond, with all sails set, was coming into the harbor of Norfolk, with a view of anchoring on the anchorage ground for small vessels between the above-named piers, and to the eastward of the channel, and the Hawarden was proceeding to sea, en route for New York, to complete its cargo.　The weather was fair, tide slack, and the wind blowing a moderate breeze of 14 miles an hour from the north, with nothing to disturb the free use of the channel, save that, slightly below the scene of the collision, two barges, the Nanticoke and the Winstead, were anchored together on the flats to the immediate eastward of the cut channel, the barge Hock, an unusually large barge, also anchored on the flats just above, and to the southward of the other two barges, her stern extending somewhat into the channel, and the barge Champlain, in tow of the tug Elsie, coming down the channel, further to the southward of the Hock, and navigating at an angle partially in and largely out of the cut channel.

[1] The schooner's case is that while proceeding up the river, with a view of coming to anchor, upon rounding the black buoy just above

Lambert's Point merchandise piers, leaving the same close on her port hand, she took her course under a starboard helm to bring her round the stern of the Hock, intending to anchor slightly above that barge; that after making this departure she observed the steamship Hawarden straightening out from the Engineer pier, taking her course down the channel, and proceeding at a rapid rate of speed, the two vessels being approximately head on, or nearly so; that the schooner was making only some two or three knots an hour, and proceeding strictly on her course to the anchorage grounds, relying on the ship, the burdened vessel, charged with the duty of avoiding collision and the risk thereof, to keep out of the way; that as the schooner came close to and rounded the Hock, for the first time she observed the barge Champlain in tow of the tug Elsie, lashed alongside, proceeding down the river in such a position that the three vessels—the Richmond, the tug and tow, and the Hawarden—would pass about abreast of the Hock, the anchored barge, and in very close proximity to it; that the schooner's view of the tug and tow had been obstructed by the barge Hock, though they were at all times in plain view of the Hawarden. Upon perceiving the danger, and the impossibility of the Richmond holding her course without colliding with the tug and tow, or running into the anchored barge, the schooner sought to avoid collision by porting, and slackening the spanker, believing that the steamship would keep out of the way, or at least slacken her speed, or stop, or reverse. But she did neither, and continued under a starboard helm, without slackening speed, or stopping, or reversing, or giving any warning whatever, causing the Richmond and Hawarden to come in collision; the steamship's starboard bow striking the schooner's stem and headgear with great force.

The Hawarden's case is that on the evening in question, upon coming out from the Engineer pier to approximately mid-channel, she took her departure down channel to go to sea, bearing on the eastward of the channel; that when she had gone a distance of about 1,500 feet she observed the Richmond sailing up the harbor, on a course to the westward side of the channel, practically head on, but slightly on the Hawarden's port bow; that the course of the two vessels was then port to port, without risk of collision; that while thus proceeding, and when they were about a ship's length apart, the Richmond suddenly hard-astarboarded, throwing herself immediately across the ship's course; that the Hawarden starboarded, and the Richmond passed her bow in safety, but she again suddenly put her wheel hard aport, and ran into the steamship, striking her some 25 feet abaft the stem on the starboard side, tearing away the schooner's bowsprit, and other portions of her rigging. The Hawarden insists that there was no danger to the schooner, had she continued on her course on the port to port passage, as the whole channel way was virtually open to her to the westward, and that she would have avoided danger under the starboard maneuver she attempted to make, but for changing her course the second time, under her port helm, and that she could have avoided the collision, either with the Hock or the tug and tow, by proper and timely maneuvering on her part.

The positions taken by the vessels are the very antithesis, one of the other, and it is impossible to determine the case on its merits, without deciding which view is to be accepted. Each vessel took evidence to support its contention, the same being directly in conflict in all essential particulars, and the contest in this respect will also have to be solved.

The Hawarden's Case will be first considered. Did the collision come about as claimed by the ship, and was it possible that it could have so occurred? It seems to the court, upon full consideration of the entire testimony, after giving much thought and consideration to the same, that it did not, and could not have happened as the steamship claims. The schooner would not likely have been guilty of such obviously foolish and reckless navigation, the claim being that while she was sailing safely on the western side of the channel, and away from danger of collision with the down-coming steamship, she suddenly, and at a time it would have been extremely perilous to have done so, hard-astarboarded, and ran immediately across the bows of the fast-approaching powerful steamship. Had this been done, which maneuver courts of admiralty have frequently said is highly improbable, and generally not true (Haney v. Balto. S. P. Co., 23 How. 287, 291, 293, 16 L. Ed. 562; The Lauretta Speddin [C. C. A. 4th Circuit] 184 Fed. 283, 285, 106 C. C. A. 425; The Curtin [D. C.] 205 Fed. 989, 990, affirmed 217 Fed. 245, 133 C. C. A. 519; The Surf [D. C.] 230 Fed. 485, 489), it is inconceivable that the schooner would have taken a second chance to be run over, by suddenly putting her wheel to port, and running into the starboard side of the steamship, after passing under her bow. This would have been even more reprehensible conduct; besides, it would have been next to impossible, within the distance between the vessels, and the speeds they were running, one approximately seven knots and the other three knots an hour, to have effected these maneuvers. Such a thing as the schooner running across the course of the steamer, and striking her starboard bow with her bowsprit, might have happened, had the Richmond been making across the course of the steamship under a starboard helm, with a view of going to anchor, as claimed by her; but to suppose it could have occurred with the two vessels running approximately at right angles, and the sailing vessel to have suddenly swerved a second time, and run around and into the starboard bow of the steamship, is not conceivable.

Upon the steamship's own showing, she cannot escape responsibility for this collision, assuming the vessels were passing as claimed by her, and that the schooner suddenly starboarded and crossed her course. Merely starboarding, which is all she says she did, was possibly the very worst thing for her to have done. It is true, it avoided the violation of the rule which forbade her crossing ahead of the course of the sailing vessel; and it is equally clear that it was a reckless and dangerous thing to have done, bearing in mind her obligation to avoid even the risk of collision. With the vessels only the length of the ship apart, she should have done more than starboarded (The Manaway [D. C.] 257 Fed. 476, 477); she should have slackened her speed, stopped, or reversed, and given danger signals, indicating

the situation as it existed. Had she done so, she would not have had to depend upon her inability to do something effectual to avoid the risk of collision, after the sailing vessel made, according to the ship's claim, the second effort to run into her, by porting her wheel. The vessels at this last-named period were virtually in collision, and what was done at that time by the schooner and the steamship should be treated as error in extremis.

Moreover, the court is persuaded that this alleged sudden change of course to starboard on the part of the Richmond never occurred at all, as it is manifest she could not have made the movements claimed by the Hawarden between the time the Richmond was, as is claimed, on a passage port to port, and the collision. This distance was approximately a quarter of a mile, and the ships were making between them 10 to 12 knots an hour, which would take about a minute and a quarter to cover the intervening space. It is evident that the Richmond was proceeding all the time after she rounded the black buoy, and made her departure for the anchorage grounds, under a starboard helm; and when the navigators of the Hawarden observed her proceeding to starboard, she was on this course, and they were mistaken in supposing that she was making a sudden and erratic change of course. This view is strongly borne out by the fact that the ship's navigators did not observe the presence of the schooner until the ship had proceeded on her course some three lengths, or 1,300 feet, approximately one-half of the entire stretch to be navigated, which greatly lessened the distance within which the vessels' movements could and should have been observed, and strengthens the view that the ship's navigators may have entirely misconceived the real movements of the schooner.

In considering the ship's navigation in connection with the collision in question, sight should not be lost of other breaches of the rules of navigation, which did or might have entered into bringing about the same:

(a) She was navigating without a lookout, depending on those on the bridge, charged with other and important duties and responsibilities, namely, the master, third officer, and pilot (the third officer being at the wheel), to discharge this duty, no one being specifically assigned thereto. The absence of a lookout is always serious, especially on a large ship navigating in a crowded harbor; and the probabilities are that on this occasion the steamship would not have proceeded approximately a quarter of a mile without observing the incoming schooner in an open roadstead, had there been a proper lookout. The George W. Childs (D. C.) 67 Fed. 269; The Dorchester (D. C.) 163 Fed. 781; The Curtin (D. C.) 205 Fed. 989; Barge No. 4—The Delmar (D. C.) 248 Fed. 823, 827-828, and cases cited; Id. (C. C. A. 4th Cir.) 257 Fed. 42, 168 C. C. A. 254.

(b) It was negligence on the part of those actually in charge of the navigation of the ship not to have seen and observed the approaching schooner earlier.

(c) The ship was proceeding at a dangerous rate of speed, namely, seven knots an hour, considering the circumstances under which she

was then surrounded, the presence of other shipping in the channel or near thereto, and passing in and out of the same, which resulted, as might have been foreseen, in her becoming involved with others lawfully occupying and navigating the channel, and as to all of which vessels the steamship was the burdened vessel, charged with the responsibility of avoiding the risk of as well as the collision itself.

[2] Moreover, the failure of the ship to produce members of her crew, who could or should have been able to throw light upon the cause of the collision, is noteworthy, Kirby v. Tallmadge, 160 U. S. 379, 16 Sup. Ct. 349, 40 L. Ed. 463; The Georgetown (D. C.) 135 Fed. 854, 855, 859; The Luckenbach (D. C.) 144 Fed. 980; The M. E. Luckenbach (D. C.) 174 Fed. 265, 269 (C. C. A. 4th Cir.); Id. 178 Fed. 1004, 101 C. C. A. 663. Only the ship's master, and two men who were aft, and knew nothing material as to the occurrence, and the pilot, were called by her to testify. Neither the third mate, who was at the wheel, nor any of those working on the forecastle head, nor those from the engine room, were produced. The evidence of those from the engine room would have been most important, as bearing upon the ship's movements.

The schooner's case will now be considered. If the court is right in its conclusion that the schooner did not make the sudden starboard maneuver across the course of the steamship, and which seems clear, her alleged conduct in that respect need not be referred to. Her course, upon rounding the spar buoy off and to the south of the merchandise piers at Lambert's Point, leaving the same close on her port side, to enable her to proceed round the stern of the Hock to anchor, would have been, as she says she was, under starboard helm. This the court thinks the testimony establishes, and that she encountered no trouble until, upon approaching the Hock, she observed the tug Elsie and the barge Champlain, her view of which had been obstructed by the stern of the Hock, in such position in the channel as made imminent a collision between herself, the Hock, the Elsie and her tow, or the steamship. In this situation, the schooner properly ported her helm, as the only thing she could do, but which resulted in collision with the steamship, instead of one of the other vessels; the schooner striking the steamship on her starboard bow, slightly abaft of her stem, with her bowsprit. The steamship at the time was swinging to starboard, and attempted to stop, but too late to avert the collision. The schooner's conduct in porting and colliding with the ship is made an assignment of fault, and it is insisted that she could have proceeded safely to anchor, or so navigated as to have brought her up into the wind, and made anchorage unnecessary, without porting her wheel. These criticisms of the schooner's navigation, are not well founded.

The court's conclusion upon the whole case is that whatever either of the vessels may have done at this juncture would be error in extremis, and that, at the time the schooner discovered the onward coming tug and tow and the steamship in the position she was, she was not in fault for the accident, that what was done by her master was in the exercise of his best judgment under the circumstances, and that it by no means follows that he could have averted the disaster by adopt-

ing the course suggested by the ship. The schooner, the sailing vessel, after making her departure for the anchorage grounds at the black buoy off Lambert's Point piers, was charged, as between herself and the Hawarden, only with the duty of keeping her course and speed, and especially she had the right to assume that the steamship, unincumbered, proceeding down the harbor over an open space of approximately half a mile, would know of and have observed her presence, and have so navigated as to avoid risk of collision, and of crossing or crowding her on her course, Inland rules of navigation governing this case are:

"Art. 20. When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel.

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

"Art. 29. Nothing in these rules shall exonerate any vessel or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neg-lect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." Comp. St. §§ 7859-7862, 7866, 7868.

See Haney v. Balto. S. P. Co., supra, 23 How. 289, 292, 293, 16 L. Ed. 562; Carroll, 8 Wall. 302, 306, 19 L. Ed. 392; The Chatham, 52 Fed. 396, 399, 3 C. C. A. 161 (C. C. A. 4th Cir.); The E. Luckenbach, (C. C. A. 4th Cir.) 93 Fed. 841, 35 C. C. A. 628; The Richmond (D. C.) 114 Fed. 208, 210, 213, and cases cited; The Delmar (D. C.) 125 Fed. 130, 132, and cases cited; The Lauretta Spedden (C. C. A. 4th Cir.) supra, 184 Fed. 283, 106 C. C. A. 425; The Manaway (D. C.) 257 Fed. 476, 477; Laboyteaux, Rules of the Road at Sea, 147, 148, 149.

The steamship did not observe these regulations. She knew, and the schooner did not, of the presence of the Elsie and the Champlain, as they were navigating in close proximity to her starboard, coming down from the Engineer pier. She knew, and was charged with knowledge, of the presence of the Hock at anchor, and of the other two barges near thereto, at the time closely on the eastern side of the channel; and there was no excuse for the ship, with the entire channel otherwise open, to have so navigated as to have thrown her into a position of danger with these several anchored, incumbered, and moving vessels, with all of which, as before stated, she was charged with avoiding collision, or the risk thereof. Her negligence in this respect brought about the collision with the schooner, without neglect or fault, so far as the court can see, on the part of the schooner or any of the vessels mentioned.

What has been said of the failure of the ship to call witnesses also applies to the schooner, which failed to call either of the two seamen navigating the schooner, along with the master. Whether they would have known anything is not clear; but the court is influenced in passing upon the schooner's conduct, and in reaching its conclusion as to the events bringing about the collision, largely by the fact that the evidence of the schooner's master is strongly supported by the independent testimony of the witnesses called by the schooner from the Hock, the Elsie, and the Champlain. The evidence of a witness from the Winstead was taken, but thrown out on objection for lack of notice to take the same. These witnesses from the first three vessels seem intelligent, were near by, and in position to see just what occurred, and they are positive and clear in their statements as to how the accident happened, and fully sustain the schooner's case.

It follows from what has been said that the Hawarden was solely responsible for the collision, and a decree to that effect will be entered on presentation.